## STATE OF CONNECTICUT v. JOSE A. IRIZARRY
## (AC 25895)

Flynn, C. J., and McLachlan and Pellegrino, Js.

---

Argued February 7—officially released May 2, 2006

*Alice Osedach*, assistant public defender, for the appellant (defendant).

*Joan K. Willin*, special deputy assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*,

state's attorney, and *Mary Rose Palmese*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

PELLEGRINO, J. The defendant, Jose A. Irizarry, appeals from the judgment of conviction, rendered after a jury trial, of assault in the second degree in violation of General Statutes § 53a-60 (a) (2),[1] threatening in the second degree in violation of General Statutes § 53a-62 (a) (2)[2] and criminal mischief in the third degree in violation of General Statutes § 53a-117 (a) (1) (A).[3] He claims on appeal that the trial court improperly (1) admitted evidence of four instances of his prior misconduct and (2) restricted his cross-examination of one of the victims regarding that victim's purported theft of the defendant's social security check. We disagree with both of these claims and affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In late 2002, the victims, Emma DeJesus, and her boyfriend, Wilson Correa, lived at 15 Prospect Street, apartment nine, in New Britain, and the defendant lived nearby at 59 Walnut Street. Mary Rubino, a testifying witness, lived next door to DeJesus and Correa. The defendant and DeJesus previously were married and had resided together for eighteen to twenty years. Cor-

[1] General Statutes § 53a-60 (a) provides in relevant part: "A person is guilty of assault in the second degree when . . . (2) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument other than by means of the discharge of a firearm . . . ."

[2] General Statutes § 53a-62 (a) provides in relevant part: "A person is guilty of threatening in the second degree when . . . (2) such person threatens to commit any crime of violence with the intent to terrorize another person . . . ."

[3] General Statutes § 53a-117 (a) provides in relevant part: "A person is guilty of criminal mischief in the third degree when, having no reasonable ground to believe that he has a right to do so, he: (1) Intentionally or recklessly (A) damages tangible property of another . . . ."

rea and Rubino both were well acquainted with the defendant, having known him for years.[4]

The outer doorway to 15 Prospect Street was secured, such that a visitor to the building, to gain entry, had to ring a bell for a particular apartment and speak via an intercom with its occupant, who then could admit the visitor. At about 4 p.m. on November 11, 2002, a friend of DeJesus rang the bell, and DeJesus sought to admit her. When DeJesus could not locate her friend in the lobby or hallway area of the building, Correa exited the apartment, and then the building, in search of the friend.[5]

As Correa emerged from the building, he was accosted by the defendant, who was hiding behind some mailboxes and appeared to be intoxicated. The defendant possessed a hammer inside of a plastic grocery bag that he had wrapped around his wrist. The defendant struck Correa on the head with the hammer, causing a laceration about an inch long above his eyebrow. Rubino briefly exited her apartment and viewed the defendant and Correa scuffling.[6] Correa escaped and, soon thereafter, reentered the building through a different door.

In the meantime, the defendant entered the building and proceeded to apartment nine. Once there, he yelled for DeJesus to open the door, called her a bitch and said he was going to kill her. He also struck the apartment door with the hammer repeatedly, creating holes and breaking two locks. DeJesus pounded on the wall

---

[4] Correa testified that he had known the defendant for fourteen years. Rubino testified that she had known the defendant for seven or eight years.

[5] The police report of the incident underlying the defendant's conviction indicates that Correa went outside to retrieve his wallet. This discrepancy is not material to the jury's findings.

[6] The victims' and Rubino's apartments are on the first floor of 15 Prospect Street and are separated from the building's lobby by an unsecured door with a window in it.

separating her apartment from Rubino's and shouted to Rubino to call the police. Rubino did so, then exited her apartment to encounter the defendant banging on her neighbors' door with what appeared to her to be a hammer.[7] She advised the defendant to leave because the police were coming. The defendant replied that he did not care and that he was not there, and then left. Correa returned to apartment nine, and New Britain police officers Brian Murphy and Robert Paciotti arrived.

Correa, who was bleeding profusely, was taken by ambulance to a hospital where he received several stitches. When interviewed by Murphy, he identified the defendant as his assailant. DeJesus and Rubino also identified the defendant as the person who had damaged the door to apartment nine. Murphy observed the damage to the door and its locks.

On the basis of the information given to them by Correa, DeJesus and Rubino, Murphy and Paciotti went to the defendant's apartment at about 6 p.m. on the day of the incident. The defendant voluntarily allowed the officers to enter.[8] He denied being at 15 Prospect Street that day, but when the officers asked him whether he had a hammer, he pointed to one lying in the open nearby. The hammer was seized, and the defendant was arrested and taken to the police station.

The defendant was charged in a second amended long form information with assault in the second degree, threatening in the second degree and criminal mischief in the third degree.[9] After a jury trial conducted on

[7] Rubino could see the claw of the hammer protruding from the plastic bag around the defendant's wrist.

[8] Initially, the defendant did not respond to the officers' knocks on his door, but answered when the officers returned shortly thereafter, accompanied by the defendant's landlord.

[9] The defendant also was charged in a separate, part B information with being a persistent serious felony offender pursuant to General Statutes § 53a-40 (c). That charge was based on the defendant's prior conviction of attempt to commit assault in the first degree in violation of General Statutes §§ 53a-

several days in February, 2004, the defendant was convicted of all of those offenses and received a total effective sentence of eleven years imprisonment.[10] The court also imposed permanent criminal restraining orders requiring the defendant to refrain from contact with DeJesus and Correa. This appeal followed.

I

The defendant claims first that the court improperly admitted evidence of four instances of his prior misconduct. We disagree.

The following additional facts and procedural history are relevant. Prior to the start of trial, the state filed a motion seeking to present evidence of certain instances of the defendant's prior misconduct pursuant to § 4.5 of the Connecticut Code of Evidence.[11] The state argued, inter alia, that the evidence was probative of the defendant's intent in the present case and was necessary to prove an element of the crime of threatening. The court deferred ruling on the state's motion until midtrial, at which time the state, outside the presence of the jury, made offers of proof as to the incidents in question.

The prior instances of misconduct, the first two of which the state sought to offer through the testimony of DeJesus and the second two through the testimony

49 and 53a-59 (a) (1), and assault in the second degree in violation of General Statutes § 53a-60 (a) (2). The defendant waived his right to a jury trial as to part B of the information and, on March 9, 2004, the court found him to be a persistent serious felony offender.

[10] The defendant filed a motion for a new trial; see Practice Book § 42-53; which the court denied.

[11] Connecticut Code of Evidence § 4-5 (a) provides that "[e]vidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person." Section 4-5 (b) allows, however, that such evidence is admissible for other purposes, "such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony." Conn. Code Evid. § 4-5 (b).

of Rubino, were as follows. (1) In 1987, the defendant attacked DeJesus with a machete, cutting her wrist, and attempted to attack her son.[12] (2) About two weeks prior to the hammer incident, the defendant came to the victims' apartment, and DeJesus' grandson answered the door. When the defendant saw Correa there sleeping, he rolled up his sleeves as if preparing to hit DeJesus, then said that he would not break her face because her grandson was there. The grandson pushed the defendant, who was drunk, out of the apartment. (3) Within one year of the hammer incident, the defendant came to the victims' apartment and banged on the door at about 3 or 4 a.m. He was holding a knife by its handle with the blade of the knife concealed up his shirtsleeve. (4) Also within one year of the hammer incident, the defendant came to the victim's apartment and banged on the door at between 2 and 4 a.m. He had a knife stuck down the back of his pants with the handle visibly protruding from the waistband.[13]

After hearing the offers of proof, the court concluded that the misconduct evidence was probative as to the issue of the defendant's intent in regard to the charge of threatening and that at least some of that evidence was not overly prejudicial. As to the 1987 incident, the court ruled that DeJesus could testify as to the attack on herself but not the attempted attack on her son. It allowed further that DeJesus could show the jury the resulting scar on her wrist. The court ordered, however,

---

[12] Although the defendant was convicted of assault in the second degree and attempt to commit assault in the first degree in connection with this incident and served a term of imprisonment; see footnote 9; the state sought to present evidence only as to the event itself, and not as to the defendant's conviction and resulting incarceration.

[13] During the state's offer of proof as to the third and fourth incidents, Rubino testified that she had seen the defendant in the hallway outside of the victims' apartment "[o]ver twenty times" and that "[h]e always had a steak knife in his pocket; that was everyday . . . ." The state, however, did not seek to introduce this testimony.

that in discussing the incident, the word "machete" could not be used but rather would be replaced with the word "instrument." The court allowed DeJesus to testify about the incident with her grandson but limited her testimony to the basic facts. It also permitted Rubino to testify about the two incidents in which the defendant, possessing knives, was banging on the victims' door in the early hours of the morning.[14]

The witnesses proceeded to testify before the jury, as contemplated during the offers of proof, but restricted by the court's orders. Following DeJesus' testimony regarding the first two incidents of misconduct, the court gave a brief limiting instruction to the jurors, cautioning them to consider the evidence only for purposes of establishing the defendant's intent and not to show his bad character. Following Rubino's testimony regarding the second two incidents of misconduct, the court gave a similar limiting instruction. In its final charge to the jury, the court gave a more extensive instruction as to the proper use of the misconduct evidence.[15]

---

[14] The court disallowed entirely, as too remote in time, other evidence the state sought to introduce. That evidence pertained to an incident in Puerto Rico in which the defendant purportedly chased DeJesus in a drunken rage, causing her to fall or jump down a stairwell and to suffer a broken leg. It also precluded, as not sufficiently relevant, evidence of further instances of the defendant loitering around 15 Prospect Street late at night, ringing the victims' doorbell or banging loudly on their door.

[15] The court instructed the jury as follows: "Now, you will recall [that] during the trial, I ruled [that] some testimony, as well as some evidence, has been allowed for a limited purpose only. Any testimony or evidence which I identified as being for a limited purpose will be considered by you only as it relates to the limits for which it was allowed, and you shall not consider such testimony and evidence in finding any other facts as to any other issue.

"Now, there was evidence offered by the state of prior acts of misconduct by the defendant. This is not being admitted to prove the bad character of the defendant or the defendant's tendency to commit criminal acts. Evidence of prior misconduct is being admitted only to show or establish the existence of the intent to commit a crime charged, which is a necessary element. You may not consider such evidence as establishing a predisposition on the part

The defendant now argues that the court improperly admitted evidence of the foregoing incidents of his misconduct because that evidence was not relevant to the question of his intent to terrorize the victim. He claims further that the "intent to terrorize" element of the threatening count was not at issue. According to the defendant, the misconduct evidence was more prejudicial than probative and, as a result of its admission, his "fundamental constitutional rights and . . . rights to a fair trial were violated."[16] We are not convinced.

"As a general rule, evidence of prior misconduct is inadmissible to prove that a criminal defendant is guilty of the crime of which [he] is accused. . . . Such evidence cannot be used to suggest that the defendant has a bad character or a propensity for criminal behavior. . . . Exceptions to the general rule exist, however, if the purpose for which the evidence is offered is to prove *intent*, identity, malice, motive, a system of criminal activity *or the elements of a crime*. . . . We have devel-

---

of the defendant to commit any of the crimes charged or to demonstrate criminal propensity. You may consider such evidence if you believe it and, further, if you find that it logically, rationally and conclusively supports the issues for which it is being offered by the state. But as I've indicated here, it bears on the issue of intent, and it will be defined under the intent to terrorize in the second count of the information.

"On the other hand, if you do not believe such evidence or, even if you do, if you find that it doesn't logically, rationally and conclusively support the issue for which it's being offered, namely, the intent, then you may not consider the testimony of prior misconduct for any reason. For this reason, consider the evidence only on the issue of intent and for no other purpose."

[16] The defendant cites to the fourteenth amendment to the United States Constitution and article first, §§ 8 and 9, of the constitution of Connecticut, but does not provide any substantive constitutional analysis, either state or federal, in support of this claim. We are not persuaded that the defendant's constitutional rights are implicated. "[R]obing garden variety claims [of an evidentiary nature] in the majestic garb of constitutional claims does not make such claims constitutional in nature." (Internal quotation marks omitted.) *State* v. *Izzo*, 82 Conn. App. 285, 291 n.2, 843 A.2d 661, cert. denied, 270 Conn. 902, 853 A.2d 521 (2004). Accordingly, we review the defendant's claim under the ordinary principles governing issues of claimed evidentiary error.

oped a two part test to determine the admissibility of such evidence. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. . . . Second, the probative value of the evidence must outweigh its prejudicial effect. . . .

"The primary responsibility for making these determinations rests with the trial court. We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Smith*, 88 Conn. App. 275, 285–86, 869 A.2d 258, cert. denied, 273 Conn. 940, 875 A.2d 45 (2005).

To prove that the defendant was guilty of the crime of threatening in the second degree, the state was required to establish, beyond a reasonable doubt, that the defendant "threaten[ed] to commit any crime of violence with the intent to terrorize another person . . . ." General Statutes § 53a-62 (a) (2). We previously have defined "terrorize," as used in § 53a-62 (a) (2), as meaning "to scare or to cause intense fear or apprehension." *State* v. *Crudup*, 81 Conn. App. 248, 261, 838 A.2d 1053, cert. denied, 268 Conn. 913, 845 A.2d 415 (2004). The state, therefore, needed to show that the defendant, while pounding on the door to apartment nine, threatened to kill DeJesus with the intent to scare her or to cause her to experience intense fear or apprehension.

We address at the outset the defendant's claim, repeated throughout his argument as to this issue, that he did not contest meaningfully the element of intent in regard to the charge of threatening and, therefore, the misconduct evidence was unnecessary to prove that element. Regardless of the accuracy of that assertion, we note that "[i]ntent, or any other essential element of a crime, is *always at issue* unless directly and explicitly

admitted before the trier of fact." (Emphasis added.) *State* v. *Baldwin*, 224 Conn. 347, 356, 618 A.2d 513 (1993); see also *Estelle* v. *McGuire*, 502 U.S. 62, 69–70, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) (noting that "prosecution's burden to prove every element of [a] crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense" and holding that extrinsic act evidence is not constitutionally inadmissible merely because it relates to issue that defendant does not actively contest). There was no such admission in this case. In any event, our review of the record demonstrates that the defendant, contrary to his claim here, explicitly contested whether he intended to terrorize DeJesus via his actions on November 11, 2002. In particular, as is evident from both his argument for acquittal and his closing argument to the jury, defense counsel attempted to downplay the seriousness of the defendant's conduct at the door to the victims' apartment and to characterize his intent as merely to irritate or to annoy DeJesus.[17]

The defendant's claim that his prior acts of misconduct were not relevant to his intent to terrorize DeJesus on November 11, 2002, is similarly unconvincing. "Because intent is almost always proved, if at all, by circumstantial evidence, prior misconduct evidence, where available, is often relied upon." (Internal quotation marks omitted.) *State* v. *DeJesus*, 91 Conn. App.

---

[17] In arguing for acquittal, defense counsel, in addressing the threatening count, urged that given the ongoing relationship between the defendant and DeJesus, it was not plausible that he intended to terrorize her or to instill in her a sense of fear. He argued further that the defendant's actions on November 11, 2002, were not intended to cause "a state of intense fright, apprehension or stark fear on [DeJesus'] part," but instead, "probably some extreme irritation and annoyance" or "noise and alarm."

In his closing argument to the jury, defense counsel explained that terror involved "intense fright or apprehension, stark fear," and again claimed that as a result of the defendant's actions, DeJesus merely "may have been annoyed. She may have been pissed off at him . . . but that's not the same thing as what has been defined as terrorize through the statute."

47, 56–57, 880 A.2d 910 (2005); see also 3 Jones on Evidence (1998) § 17:60, p. 481 ("[e]xtrinsic act evidence is often a useful source of circumstantial evidence of what a person's mental state was on the occasion in question"). Evidence is relevant if it "has a logical tendency to aid the trier in the determination of an issue. . . . All that is required is that the evidence tend to support a relevant fact even to a slight degree . . . ." (Internal quotation marks omitted.) *State* v. *Erhardt*, 90 Conn. App. 853, 861, 879 A.2d 561, cert. denied, 276 Conn. 906, 884 A.2d 1028 (2005). When instances of a criminal defendant's prior misconduct involve the same victim as the crimes for which the defendant presently is being tried, those acts are especially illuminative of the defendant's motivation and attitude toward that victim, and, thus, of his intent as to the incident in question. See, e.g., id., 860–61 (prior incidents of defendant's physical violence toward victim tended to indicate he meant to cause her physical injury in charged crime).

Although we are unable to locate a Connecticut case directly on point,[18] we find guidance in a decision of the Supreme Court of Illinois rejecting a sufficiency of the evidence challenge and upholding a defendant's conviction pursuant to an antistalking statute. See *People* v. *Bailey*, 167 Ill. 2d 210, 657 N.E.2d 953 (1995),

---

[18] The case of *State* v. *Hoskie*, 74 Conn. App. 663, 813 A.2d 136, cert. denied, 263 Conn. 904, 819 A.2d 837 (2003), has significant parallels to the present matter, but the claim on appeal differed from the issue here. In *Hoskie*, the defendant was convicted of the crime of kidnapping in the first degree, an element of which is abduction and restraint of another person "with intent to . . . terrorize [that person] . . . ." General Statutes § 53a-92 (a) (2) (C). The trial court had allowed the state to introduce evidence that the defendant engaged in threatening behavior toward the victim on several occasions prior to the incident in question for the purpose of proving that he intended to terrorize her. *State* v. *Hoskie*, supra, 666–67. Although the relevance of the admitted evidence was not contested on appeal, we upheld its admission against a challenge that it was overly prejudicial. Id., 668–70.

overruled on other grounds by *People* v. *Sharpe*, 216 Ill. 2d 481, 519–20, 839 N.E.2d 492 (2005). That statute, similar to the threatening provision at issue here, required the state to prove that the defendant had threatened the victim "with the intent to place [her] in reasonable apprehension of death, bodily harm, sexual assault, confinement or restraint." *People* v. *Bailey*, supra, 243. The defendant was charged in connection with his statements to the victim, who was his former girlfriend, that she should kiss her children goodbye, that he was going to "blow [her] away" and that she would not "make it to [her next] birthday." (Internal quotation marks omitted.) Id., 219–20. The defendant denied intending to place the victim in apprehension of bodily harm, and he testified, in essence, that he and the victim, at the time of the events in question, had an ongoing relationship. Id., 220–21.

At trial, the state was permitted to introduce evidence of several prior instances of the defendant's aggressive and threatening conduct toward the victim.[19] On appeal, the Supreme Court of Illinois concluded that on the basis of this evidence, the trial judge properly found that when the defendant made the foregoing statements to the victim, "he possessed the requisite intent to place her in reasonable apprehension of bodily harm." Id., 245. In so holding, the court necessarily concluded that the defendant's previous aggressive and threatening actions toward the victim were relevant to the issue of his intent to frighten her by making the statements in question.

---

[19] The victim was permitted to testify about incidents in which the defendant: (1) restrained her in his apartment, spit on her and called her names; (2) followed her in her car, driving aggressively, and, once she stopped to call police, pounded on her window and called her names; (3) encountered her in a parking lot and caused damage to her car while calling her names; and (4) telephoned her, threatening to "come over with a gun" and harm her and her children. (Internal quotation marks omitted.) *People* v. *Bailey*, supra, 167 Ill. 2d 244–45.

We conclude likewise in the present matter that the defendant's violent and threatening behavior toward DeJesus in the past was relevant to show his intent to cause her intense fear or apprehension on November 11, 2002, when he pounded on her door with a hammer and stated that he would kill her.[20] Given that the defendant previously had threatened DeJesus and, on at least one occasion, actually had caused her injury, the evidence of his past behavior had a tendency to show that by his actions on November 11, 2002, he did not intend merely to annoy or to irritate her, but rather, to cause her intense fear or apprehension. Accordingly, the court properly admitted testimony as to the previous incidents pursuant to the first part of the test for admissibility of prior misconduct evidence. See *State* v. *Smith*, supra, 88 Conn. App. 285.

As to the second part of that test, the defendant urges us to conclude that the evidence nevertheless was overly prejudicial due to its extent and character. We acknowledge that "[a]ll adverse evidence is damaging to one's case, but [nevertheless, that evidence] is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury." (Internal quotation marks omitted.) *State* v. *Ali*, 92 Conn. App. 427, 434, 886 A.2d 449 (2005), cert. denied, 277 Conn. 909, 894 A.2d 990 (2006). Given the facts of this case and the nature of the evidence, we consider that standard to be unsatisfied. Admission of multiple instances of prior misconduct is not per se

[20] In regard to the defendant's assertion that the misconduct evidence could be relevant only to the question of his intent to cause physical injury, and not to his intent to terrorize, we note simply that those two intentions are not necessarily mutually exclusive. See *State* v. *Niemeyer*, 258 Conn. 510, 526, 782 A.2d 658 (2001).

improper; see, e.g., *State* v. *Hoskie*, 74 Conn. App. 663, 667–70, 813 A.2d 136 (upholding admission of evidence of four instances of misconduct), cert. denied, 263 Conn. 904, 819 A.2d 837 (2003); and, furthermore, the misconduct evidence in this case was no more shocking than the evidence of the crimes with which the defendant was charged.

We observe in conclusion that the court, outside the presence of the jury, carefully considered the proffered misconduct evidence and the parties' arguments as to its admissibility before determining that it was more probative than prejudicial. The court in fact disallowed other misconduct evidence the state sought to introduce; see footnote 14; and ordered the admitted testimony to be stated concisely and phrased in noninflammatory terminology. Furthermore, although it was not required to do so, the court minimized any potential prejudice by repeatedly giving limiting instructions as to the use of the evidence.[21] The care with which the court weighed the misconduct evidence and devised measures for reducing its prejudicial effect militates against a finding of abuse of discretion. See *State* v. *Erhardt*, supra, 90 Conn. App. 862. On the basis of

---

[21] The defendant, in the course of his argument as to this claim, also attempts to argue that one of the court's three limiting instructions was misleading and likely confused the jury. It is well established, however, that "a claim that a court failed to instruct a jury properly with regard to evidence admitted for a limited purpose is distinct from a claim related to the admissibility of such evidence." *State* v. *Orellana*, 89 Conn. App. 71, 96 n.9, 872 A.2d 506, cert. denied, 274 Conn. 910, 876 A.2d 1202 (2005). Although the defendant properly preserved his claim of error as to the admissibility of the misconduct evidence, he did not raise any objection to the instruction that he now challenges on appeal. Even were we to accept the defendant's cursory citation of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as adequate to justify our review of this unpreserved claim, the claim necessarily would fail under the second prong of *Golding* because the alleged "failure [of a court] to give an adequate limiting instruction . . . is not of constitutional magnitude." (Internal quotation marks omitted.) *State* v. *DeJesus*, supra, 91 Conn. App. 67.

the foregoing analysis, we conclude that the court acted within its discretion when admitting the challenged evidence.

## II

The defendant also claims that the court improperly restricted his cross-examination of DeJesus in regard to her alleged theft of his social security check. We disagree.

The following additional facts and procedural history are pertinent to the claim. Prior to the start of trial, the state filed a motion in limine via which it sought to preclude the defendant from questioning DeJesus regarding a police report dated February 26, 2003.[22] See Practice Book § 15-3. The report was prepared by the investigating officer, Frank Surowiec, in response to a complaint from the defendant's landlord, Frank Maccarone, regarding an alleged larceny. According to the report, Maccarone told Surowiec that the defendant had authorized him to receive the defendant's mail when he was incarcerated following the hammer incident. He indicated that he had not received the defendant's February, 2003 social security check and that he believed DeJesus had it, although she said she did not. Maccarone also told Surowiec that he had spoken with another individual named Esperanza Tirado, who told Maccarone that DeJesus had asked her to cash the check. Maccarone additionally reported speaking with the local mail carrier, Michael Kristopik, who said he had left the defendant's mail, including the check, at DeJesus' mailbox.

The report indicates that Surowiec then interviewed Kristopik, who confirmed leaving the check "at

---

[22] The defendant did not seek to have the police report introduced into evidence, and it was not marked for identification at trial. It is, however, part of the record on appeal by virtue of the defendant's successful motion for rectification, by which he requested that the report be made an exhibit for identification purposes only. See Practice Book § 66-5.

[DeJesus'] mailbox." Kristopik said DeJesus had told him that Maccarone was not getting the defendant's mail to him and that she was authorized to receive that mail. Kristopik reported that he believed DeJesus, knowing that she and the defendant had had a long-term relationship. He told Surowiec that once he learned that there was a problem with the defendant's mail, he ceased delivering it to anyone until he received written authorization from the defendant. Surowiec concluded his report by noting that he had attempted to contact DeJesus, Tirado and Rubino[23] but was unsuccessful.

In its motion in limine, the state argued that the report was based entirely on hearsay, that it never resulted in any arrests and that the case had been closed. It further characterized the issue of the missing check as collateral to the present matter. The court deferred ruling on the motion until trial, and, during the cross-examination of DeJesus, the jury was excused, the defendant made an offer of proof and the parties presented argument.

The court found that the police report provided a sufficient good faith basis for at least some inquiry, in particular "because of the independent recollection of a mail carrier."[24] The court considered DeJesus' acceptance of the defendant's mail to be inconsistent with her earlier characterization of their relationship as over and, thus, relevant as to her credibility. It concluded, however, that on the basis of the police report alone, any claim that DeJesus had stolen the defendant's social security check was too speculative and, in any event, collateral. Ultimately, the court allowed the defendant to ask DeJesus only whether she told Kristopik that he could leave the defendant's mail, including the February check, with her and whether the defendant authorized

---

[23] According to Kristopik, Rubino was present when he spoke with DeJesus about the defendant's mail.

[24] There were indications that Maccarone and Tirado, in contrast, were friends of the defendant. Neither of those individuals testified at trial.

her to cash that check. It disallowed any questioning pertaining to the purported theft of the check or other peripheral matters.[25] DeJesus was recalled to the witness stand and answered the permitted questions in the negative.

Thereafter, following an offer of proof, the defendant called Kristopik to testify for the purpose of impeaching DeJesus. The court limited questioning of Kristopik to queries essentially mirroring those posed to DeJesus, i.e., whether she had told him he could leave the defendant's mail with her and whether he left the mail, including the check, with her. Kristopik answered those questions in the affirmative. The court also allowed defense counsel to inquire about what knowledge, if any, Kristopik had of the relationship between the defendant and DeJesus. Kristopik stated that the two used to be married and that he used to see DeJesus near the defendant's apartment.[26]

During the offer of proof as to Kristopik, defense counsel had expressed concern about whether the state, on cross-examination of the witness, would cause Kristopik to appear biased against DeJesus due to a mild reprimand that he apparently had received from his supervisor for delivering the defendant's mail to her. The court, therefore, allowed defense counsel to attempt to lessen the effect of any potential impeachment by addressing that subject first on direct examination. Accordingly, defense counsel asked Kristopik whether, as a result of his delivery of the defendant's mail to DeJesus, "there [were] any ramifications to

[25] Specifically, the court precluded questions regarding Rubino's presence when DeJesus spoke with Kristopik, whether DeJesus told Kristopik that the defendant was not receiving his mail and checks, DeJesus' relation to Tirado and whether DeJesus had asked Tirado to cash the February check.

[26] The court disallowed more detailed questioning as to what, specifically, DeJesus had told Kristopik about why he should leave the defendant's mail with her.

[Kristopik] professionally?" Kristopik replied, "I was warned. I was given a warning, actually, because I was a little concerned, and I went to my supervisor, my postmaster, actually, explained what had happened, and he told me that I should always play it by the book."

At the close of her cross-examination of Kristopik, the prosecutor briefly revisited the matter of his reprimand. The following colloquy ensued:

"[The Prosecutor]: Okay. Now, you were asked some questions that you had some problems, minor problems, at work about this.

"[The Witness]: Well, I was concerned after things developed, and I sought out my postmaster and asked his opinion and told him what was going on and—just in case something came back to him, I wanted him to hear from me first—

"[The Prosecutor]: Okay.

"[The Witness]:—what had happened.

"[The Prosecutor]: All right. And he gave you a warning?

"[The Witness]: Well, he said, you know, never do it, always play it by the book. It's not your responsibility to get involved, you know, with them, you know—look—in other words, bottom line, look—take care of yourself, look out for yourself first.

"[The Prosecutor]: All right. So, I take it as a result of all of that, though, you probably weren't too happy with Emma. Is that fair to say?

"[The Witness]: Yeah, at the time. Yeah, I was disappointed. I felt misled."

At that point, defense counsel asked that the jury be excused and proceeded to argue, in essence, that through the foregoing exchange, the state had raised

the issue of the missing check and, therefore, he should be allowed to explore that topic. The court disagreed, opining that the only inference raised by the state's questioning was that "the United States Postal Service probably requires postal carriers only to deliver to the named person at the named address unless it's in writing from that person to go forward it somewhere else."

The defendant now claims that the court improperly prohibited him from further cross-examining DeJesus concerning her involvement with the missing check, specifically, from asking her whether she had stolen it or had asked Tirado to cash it for her. He claims that those questions were proper to demonstrate DeJesus' bias or interest in testifying falsely, i.e., to show that DeJesus had a financial incentive to keep the defendant in jail because she could collect and cash his social security checks or that she was vengeful toward him "for causing a police complaint against her." The defendant argues further that the sought testimony was misconduct evidence admissible to undermine DeJesus' veracity in general. Alternatively, he argues that the state, during its cross-examination of Kristopik, opened the door to the admission of evidence regarding the missing check. According to the defendant, the court's rulings violated his constitutional rights to cross-examination and confrontation. We are not persuaded.

The law governing this claim is well settled. "It is axiomatic that [a criminal] defendant is entitled fairly and fully to confront and to cross-examine the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. . . . In order to comport with the constitutional standards embodied in the

confrontation clause, the trial court must allow a defendant to expose to the jury facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. . . .

"The confrontation clause does not, however, suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . Only relevant evidence may be elicited through cross-examination. . . . The court determines whether the evidence sought on cross-examination is relevant by determining whether that evidence renders the existence of [other facts] either certain or more probable. . . .

"The trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . .

"The proffering party bears the burden of establishing the relevance of the offered testimony. *Unless such a proper foundation is established, the evidence . . . is irrelevant.* . . . This may be accomplished in one of three ways.

"First, the defendant can make an offer of proof. . . . Second, the record independently can be adequate to establish the relevance of the proffered testimony. . . . Finally, the defendant can establish a proper foundation for the testimony by stating a good faith belief that there is an adequate factual basis for his inquiry. *A good faith basis on the part of examining counsel as to the truth of the matter contained in questions propounded to a witness on cross-examination is required.* . . . A cross-examiner may inquire into the motivation of a witness if he or she has a good faith belief that a factual

predicate for the question exists." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Barnes*, 232 Conn. 740, 745–48, 657 A.2d 611 (1995). We conclude that the defendant failed to establish, by any of these methods, the relevance of the claimed testimony. In short, the line of questioning he sought to pursue was based on wholly speculative information lacking the necessary indicia of reliability.

To begin, although the defendant made an offer of proof in the form of the police report,[27] that report did not constitute reliable evidence that DeJesus had stolen the defendant's February, 2003 social security check. The only indication of the theft or attempted theft of the check apparent from the report was in the form of a double hearsay statement uttered by one nontestifying individual to another and recorded by a nontestifying police officer, namely, Maccarone's statement to Surowiec regarding what Tirado purportedly had told Maccarone. Although Tirado apparently was present in the courtroom for at least some portion of the trial, defense counsel did not call her to testify as part of his offer of proof, nor was there any indication that he attempted, e.g., to learn more from Surowiec or Maccarone, to question DeJesus himself or to contact the Social Security Administration to determine the status of the check in question. Neither did he offer any other independent evidence showing that DeJesus had possessed the check that was left "at [her] mailbox" or that anyone had attempted, successfully or not, to cash that check. Finally, defense counsel never stated to the court that he had a good faith belief that DeJesus had stolen the defendant's check.

---

[27] Although the report was not marked for identification purposes only until the granting of the defendant's posttrial motion for rectification, it is clear from the trial transcript that the court had a copy of the report and relied on it in ruling on the admissibility of the proffered testimony.

Insofar as there was no reliable evidence that DeJesus had stolen the check in question or, in any event, that she had the ability to cash checks payable to the defendant or that she still was receiving them, it necessarily follows that defense counsel lacked the proper foundation for questioning her about any financial incentives for her testimony. Moreover, because there was no evidence presented that DeJesus was even aware of the police report, the defendant's suggestion that she was angry with him due to Maccarone's complaint is entirely without basis. We conclude that the defendant, like the defendant in *Barnes*, "attempted to use cross-examination as a tool to investigate purely speculative sources of witness bias, rather than as a tool to discredit testimony on the basis of a preexisting good faith belief that bias existed. [I]t is entirely proper for a court to deny a request to present certain testimony that will further nothing more than a fishing expedition . . . or result in a wild goose chase." (Citation omitted; internal quotation marks omitted.) *State* v. *Barnes*, supra, 232 Conn. 749–50. Consequently, the court did not abuse its discretion in disallowing the proposed testimony for purposes of showing DeJesus' bias or interest in testifying falsely.

For similar reasons, the defendant's argument that the testimony should have been permitted as misconduct evidence, bearing on DeJesus' general veracity, also must fail. It is true that counsel has the right to cross-examine a witness concerning specific acts of that witness' misconduct "if those acts bear a special significance upon the [issue] of veracity," and, further, "that larcenous acts tend to show a lack of veracity." (Internal quotation marks omitted.) *State* v. *Manns*, 91 Conn. App. 827, 838, 882 A.2d 703, cert. denied, 276 Conn. 927, 889 A.2d 818 (2005); see also Conn. Code Evid. § 6-6 (b). Like questioning designed to expose a witness' bias or interest in testifying falsely, however,

questioning regarding witness misconduct bearing on veracity, to be pursued properly, must have some good faith basis. See C. Tait, Connecticut Evidence (3d Ed. 2001) § 6.32.4, p. 463 ("[b]efore a witness may be asked about his or her prior acts of misconduct, the questioner must have a good-faith basis for believing that the witness has committed the act inquired about"); see, e.g., *State* v. *Colon*, 272 Conn. 106, 206–209, 864 A.2d 666 (2004) (holding that court did not abuse discretion in concluding that anonymous letter to newspaper editor did not establish good faith basis for cross-examining witness regarding his alleged prior misconduct), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005). Here, for the reasons already explained, the proper foundation was lacking.

Finally, we disagree with the defendant's claim that the state, through its cross-examination of Kristopik, raised the issue of the missing or stolen check such that inquiry into that subject by defense counsel became warranted. "Generally, a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject. . . . The party who initiates discussion on the issue is said to have opened the door to rebuttal by the opposing party. Even though the rebuttal evidence would ordinarily be inadmissible on other grounds, the court may, in its discretion, allow it where the party initiating inquiry has made unfair use of the evidence." (Internal quotation marks omitted.) *State* v. *Powell*, 93 Conn. App. 592, 599, 889 A.2d 885, cert. denied, 277 Conn. 924, 895 A.2d 797 (2006); see also C. Tait, supra, § 1.32.3, p. 94 (door may be opened on either direct or cross-examination).

Here, when cross-examining Kristopik, the prosecutor did nothing more than revisit the same subject that defense counsel already had addressed, i.e., whether the mail carrier had been reprimanded for delivering

the defendant's mail to DeJesus absent the proper authorization. The answers given on direct and cross-examination were highly similar. The prosecutor's questions did no more to imply that Kristopik had been reprimanded because of a stolen check than did defense counsel's previous inquiry, and, therefore, did not open the door to exploration of that subject. In sum, the court did not abuse its discretion in disallowing questioning about the defendant's allegedly stolen February, 2003 social security check.

The judgment is affirmed.

In this opinion the other judges concurred.