STATE OF CONNECTICUT *v.* KYLE KANTOROWSKI
(AC 33971)

Gruendel, Sheldon and Dupont, Js.

Argued March 14—officially released July 30, 2013

*Wayne Jekot,* assistant public defender, with whom was *James B. Streeto,* assistant public defender, for the appellant (defendant).

*Susan C. Marks,* supervisory assistant state's attorney, with whom, on the brief, were *Maureen Platt,* state's attorney, and *Karen Diebolt,* assistant state's attorney, for the appellee (state).

GRUENDEL, J. The defendant, Kyle Kantorowski, appeals from the judgments of conviction, rendered after a jury trial, in docket number CR-10-391835, of violating a restraining order in violation of General Statutes § 53a-223b, harassment in the second degree in violation of General Statutes § 53a-183 (a) (3) and threatening in the second degree in violation of General Statutes § 53a-62 (a) (2), and, in docket number CR-11-398041, of violating a restraining order in violation of § 53a-223b and harassment in the second degree in violation of § 53a-183 (a) (3). On appeal, the defendant claims that (1) the trial court improperly permitted the state to introduce evidence of prior uncharged misconduct and (2) he was deprived of a fair trial as a result of prosecutorial impropriety. We affirm the judgments of the trial court.

The jury reasonably could have found the following facts. In June, 2010, the victim, Melissa Thompson, began receiving threatening telephone calls and text messages from the defendant, a former boyfriend with whom she had lived years earlier. In those messages, the defendant told the victim that "he was going to cut [her] head from limb to limb and hang it from his mirror. That he was going to run [her] father over and [her] boyfriend over with a lawn mower and . . . he said he was going to stake [her] heart out and feed it to [her] boyfriend. He said he was going to kill [her]." As a result, the victim filed an application for relief from abuse on June 30, 2010, that named the defendant as the respondent. In that application, the victim swore that the defendant was a person with whom she previously had a dating relationship and that she had "been subjected to a continuous threat of present physical pain or physical injury" by him. The victim thus requested "that the court order ex parte (immediate)

relief because I believe there is an immediate and present physical danger to me . . . ." The court granted the application that same day. Its restraining order required, inter alia, that the defendant "not assault, threaten, abuse, harass, follow, interfere with, or stalk" the victim and that he "not contact the [victim] in any manner, including by written, electronic or telephone contact, and do not contact the [victim's] home, workplace or others with whom the contact would be likely to cause annoyance or alarm to the [victim]." A hearing on the matter was scheduled for July 14, 2010.

Hours after the protective order issued, the victim's automobile was vandalized in the parking lot of the PetSmart establishment located at 475 Bank Street in Waterbury, where the victim was employed. Specifically, someone carved the word "cunt" into the door of the vehicle on the driver's side and slashed the tires.[1]

Because the defendant's calls in June, 2010, were made to her cell phone and her parents' home, where she resided, the victim and her family "had to change [those telephone] numbers and . . . list[ed] [them] as private." At that point, the defendant began calling the victim at work. As the victim testified, "[i]t was like an everyday thing. We'd get calls, hang-ups, calls, hang-ups, threatening calls saying . . . tell [the victim] thanks for changing her phone number. That I was a dead girl. I was going to get a lot worse than what I did. And a whole bunch of other stuff. . . . He threatened me so many times . . . . [My coworkers] actually stopped letting me answer the phones because I was just getting really upset about it . . . ." Jacqueline Marie Bowen, a coworker at PetSmart, testified at trial that the defendant's telephone calls to the store began "at the end of

---

[1] Although this court ordinarily does not repeat such profanity, the language employed by the defendant is pertinent to a proper evaluation of his behavior and the inquiry into whether he intended to harass, annoy, alarm or terrorize the victim, as charged.

June" and occurred "[a]ll the time. I mean, the whole time, the whole day . . . while I was there. And there were times when, if [the victim] wasn't there, the calls would continue. And I would just say she's not here. And then . . . [i]t would stop." Another coworker, Valerie Vargas, likewise testified that the defendant's calls to the store started "[t]oward the end of June" and contained "derogatory, threatening messages."

On July 6, 2010, Vargas received one such telephone call at PetSmart. The caller asked for the victim by name and then identified himself as "Kyle." As Vargas testified: "He said, can you put [the victim], that C-U-N-T, on the phone? . . . I didn't give [her] the phone, obviously. Then, he said, can you tell her that I'm following Chris, her little boyfriend? He's by exit 17 and he's about to get into a really bad car accident. . . . I just didn't say anything. I said, have a good day, it's PetSmart, and I hung up the phone." The victim contacted the Waterbury Police Department and Officer Adrian Sanchez responded. The victim informed Sanchez that the defendant, a former boyfriend, had been constantly calling her workplace. Although Sanchez confirmed that the victim had "a full no-contact order against" the defendant, Sanchez could not locate an address or contact information for him. As a result, Sanchez left his report open and forwarded it to the detective bureau.

On July 11, 2010, the victim answered the telephone at PetSmart and recognized the defendant's voice. As the victim recounted at trial, the defendant "told me he was going to kill me." The victim hung up the telephone and contacted the police. Officer Kimberly Binette responded to the call at the PetSmart store and spoke to the victim, whom she described as "crying, shaking, very upset, nervous." Binette verified that the protective order was in place and thereafter arrested the defendant.

The defendant subsequently was charged with the aforementioned offenses under separate docket numbers pertaining to the July 6 and July 11, 2010 incidents. The cases were consolidated and a jury trial followed, at the conclusion of which the jury found the defendant guilty on all counts. The court rendered judgments accordingly and sentenced the defendant to a total effective term of five years incarceration, execution suspended after one year, and three years of probation subject to various special conditions. The court further imposed a standing criminal protective order to protect the victim from the defendant.[2] This appeal followed.

I

The defendant first claims that the court abused its discretion in admitting two instances of prior uncharged misconduct. We disagree.

The following additional facts are relevant to this claim. Prior to trial, the state filed a general notice of uncharged misconduct, informing the defendant of its intention to rely on prior uncharged misconduct evidence. In response, the defendant filed motions in limine to preclude introduction of, inter alia, evidence of uncharged misconduct on the part of the defendant.

---

[2] As the court explained to the defendant at sentencing: "One of the things that's going to happen now is, I'm going to give you a standing criminal protective order. It's a court order. Look, you are not going to jail for the rest of your life. In the grand scheme of things you are not going to jail for that long. You are going to be getting out soon. And there will be a court order in place for the rest of your life protecting this young lady from you. And it must be obeyed. Because if it isn't, you are not going to get anything like the sentence I'm going to give you now. . . . You are not to assault, threaten, abuse, harass, follow, interfere with or stalk [the victim]. You are to stay away from her home or wherever she lives. You are to have absolutely no contact with her. No contact means no phone calls, no writing to her, no in-person contact, even if she says it's okay. No electronic communication, text, e-mail, Facebook, My Space, any social media. Nothing. . . . It's a felony if you violate this protective order and you can go to jail for a long time."

The defendant also filed a motion to require more specific notice of the uncharged misconduct evidence. The state then filed a notice of intent to use four specific instances of uncharged misconduct, only two of which are at issue in this appeal. The state's notice stated in relevant part that it sought to introduce evidence that (1) "[o]n or about April 2006 . . . the defendant choked the [victim] and caused her hand to be broken in the struggle, in Greenville, North Carolina," and (2) "[o]n or about September 2006 . . . the defendant broke the [victim's] nose by slamming her face against the floor numerous times, in Greenville, North Carolina."

Following a lengthy hearing on the matter that involved argument from both parties and an offer of proof as to the anticipated testimony of the victim, the court ruled that the uncharged evidence was admissible for trial. Specifically, it noted that "with respect to the harassment and the threatening charge . . . [the uncharged misconduct] could be seen by the jury as . . . bearing on [the defendant's] intent to harass her. That . . . he knows and she knows what their prior relationship has been, that this is not a friendly phone call . . . it's not a phone call made to make her happy but it's a phone call made to harass her, to threaten her. In light of their . . . previous interactions and that . . . [the] conversations need to be understood in that context of their entire relationship." As a result, the court found that "the probative value of that evidence is fairly high because it bears directly upon the defendant's intent in making the alleged phone calls . . . and his motive for doing so." The court further found that any potential prejudice could be alleviated by proper cautionary instructions to the jury. Finally, the court emphasized that it would permit the state very little latitude with respect to the uncharged misconduct,

stating: "I think this is important for you . . . to understand . . . I am not going to allow very much detail at all regarding these incidents. I will allow [the state] to ask a couple [of] questions about them. Certainly, the [victim] can testify that there was an altercation between the two of them, that she sustained physical injuries. The injuries can be briefly described, but we're not going into police involvement, we're not going into any of the other facts relating to those incidents. We're going to sanitize them as much as possible."

At trial, the victim testified that she met the defendant in 2005, while she was in high school and began dating him during her senior year. She was sixteen or seventeen years old at that time. The victim testified that she moved in with the defendant in Greenville, North Carolina, in February, 2006, where the defendant's parents and ten month old daughter resided. She described her relationship with the defendant as "[h]orrible" in North Carolina. The following colloquy then ensued:

"[The Prosecutor]: Are there any instances you can indicate?

"[The Victim]: There's two big ones.

"[The Prosecutor]: What is the first one?

"[The Victim]: He was choking me and I was defending myself, and I broke my hand. Then another one, when he slammed my face down on the floor numerous times.

"[The Prosecutor]: What happened as a result of that?

"[The Victim]: Broke my nose."

The victim testified that she left North Carolina at the end of November, 2006, and had little contact with the defendant in the ensuing years. In mid-June, 2010, the defendant wrote her a message on Facebook and

then "friend requested" her.[3] Although the victim initially accepted that request, she testified, "I realized that it was wrong and I took him off within the next day. And then after that is when I started getting all kinds of phone calls." When the victim informed the defendant that she didn't want to talk with him, his messages became more frequent and threatening in nature. As she testified, the defendant's calls were "nonstop. I'd get a call, five minutes later there would be another call, two minutes later there would be another call, two minutes later there would be another call." Those calls precipitated the victim's application for a protective order approximately two weeks later.

Notably, the defendant did not request a limiting instruction at the time of the victim's testimony regarding the two instances of uncharged misconduct, nor did he submit a written request to charge on that subject. In its instruction to the jury following the close of evidence, the court stated in relevant part: "[T]he state offered evidence in this case that the defendant previously assaulted [the victim] and sent her text messages or made phone calls to her around the time a restraining order was allegedly issued. The evidence of prior acts of misconduct of the defendant was not admitted to prove the bad character of the defendant or the defendant's tendency to commit criminal acts. Such evidence was offered by the state solely to establish, one, the defendant's intent; two, the identity of the

---

[3] "Facebook is a social networking website that allows private individuals to upload photographs and enter personal information and commentary on a password protected 'profile.' An individual chooses a name under which the Facebook profile will be listed (user name). Users create networks of 'friends' by sending and accepting friend requests. Subject to privacy settings that each user can adjust, a user's friends can see aspects of the user's profile, including the user's list of friends, and can write comments that appear on the profile. Additionally, any Facebook user can send a private message to any other Facebook user in a manner similar to e-mail." *State v. Eleck*, 130 Conn. App. 632, 634 n.1, 23 A.3d 818, cert. granted on other grounds, 302 Conn. 945, 30 A.3d 2 (2011).

person who committed the crimes charged in this case; and, three, the defendant's motive for the commission of the crime. You may not consider such evidence as establishing a predisposition on the part of the defendant to commit the crimes charged or to demonstrate a criminal propensity. You may consider such evidence if you believe it and further find that it logically, rationally and conclusively supports the issues for which it's being offered by the state. On the other hand, if you do not believe such evidence or, even if you do, if you find that it does not logically, rationally and conclusively support the issues for which it's being offered by the state, then you may not consider that testimony for any purpose."

The defendant now contends that the court improperly admitted the victim's testimony regarding those two instances of prior uncharged misconduct. Specifically, he claims that the court improperly concluded that such testimony was admissible under § 4-5 (b) of the Connecticut Code of Evidence and that its probative value outweighed its prejudicial effect.[4] The standard governing our review of that claim is well established. "Evidence of a defendant's uncharged misconduct is inadmissible to prove that the defendant committed the charged crime or to show the predisposition of the defendant to commit the charged crime. . . . Exceptions to this rule have been recognized, however, to render misconduct evidence admissible if, for example, the evidence is offered to prove intent, identity, malice,

---

[4] Connecticut Code of Evidence § 4-5 (b) provides: "Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony." As this court observed, "[t]he list of exceptions provided in the code of evidence is not exclusive but rather is intended to be illustrative." *State* v. *Martin V.*, 102 Conn. App. 381, 386, 926 A.2d 49, cert. denied, 284 Conn. 911, 931 A.2d 933 (2007).

motive, a system of criminal activity or the elements of a crime. . . . To determine whether evidence of prior misconduct falls within an exception to the general rule prohibiting its admission, we have adopted a two-pronged analysis. . . . First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence. . . . Since the admission of uncharged misconduct evidence is a decision within the discretion of the trial court, we will draw every reasonable presumption in favor of the trial court's ruling. . . . We will reverse a trial court's decision only when it has abused its discretion or an injustice has occurred." (Citations omitted; internal quotation marks omitted.) *State* v. *Millan*, 290 Conn. 816, 830–31, 966 A.2d 699 (2009).

## A

We first consider whether the uncharged misconduct evidence met one of the aforementioned exceptions. The court found, inter alia, that it was relevant and material to the defendant's intent in making the harassing calls. We agree.

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree,

so long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) *State* v. *Allen*, 289 Conn. 550, 562, 958 A.2d 1214 (2008). "Evidence is material where it is offered to prove a fact directly in issue or a fact probative of a matter in issue. . . . Materiality is determined by the pleadings (or information) and the applicable substantive law." (Internal quotation marks omitted.) *State* v. *Dougherty*, 123 Conn. App. 872, 877–78, 3 A.3d 208, cert. denied, 299 Conn. 901, 10 A.3d 521 (2010).

The informations filed by the state accused the defendant of, among other things, harassment in the second degree in violation of § 53a-183 (a) (3) and threatening in the second degree in violation of § 53a-62 (a) (2), both of which are specific intent crimes. To obtain a conviction for the former offense, the state had the burden to prove, beyond a reasonable doubt, the defendant's intent to "harass, annoy or alarm" the victim; as to the latter offense, the state had to prove the defendant's intent to "terrorize" the victim. As this court has noted, the term "terrorize," as used in § 53a-62 (a) (2), "means to scare or to cause intense fear or apprehension." *State* v. *Crudup*, 81 Conn. App. 248, 261, 838 A.2d 1053, cert. denied, 268 Conn. 913, 845 A.2d 415 (2004).

"Because intent is almost always proved, if at all, by circumstantial evidence, prior misconduct evidence, where available, is often relied upon." *State* v. *Baldwin*, 224 Conn. 347, 355, 618 A.2d 513 (1993). "When instances of a criminal defendant's prior misconduct involve the same victim as the crimes for which the defendant presently is being tried, those acts are especially illuminative of the defendant's motivation and attitude toward that victim, and, thus, of his intent as to the incident in question." *State* v. *Irizarry*, 95 Conn. App. 224, 235, 896 A.2d 828, cert. denied, 279 Conn. 902, 901 A.2d 1224 (2006). As the trial court aptly observed, the defendant's July 6 and 11, 2010 telephone calls "need

to be understood in [the] context of [the defendant's and the victim's] entire relationship." The uncharged misconduct evidence that the defendant previously had choked the victim and had broken her nose by slamming her face into the floor provided context as to whether he actually intended to cause her to be harassed, annoyed, alarmed or terrorized by his verbal threat that he would "kill" her. The evidence substantiates the state's assertion that the telephone calls were not mere jokes or pranks and sheds additional light on the evidence that the defendant, in a call made days prior to the July 6 and 11, 2010 incidents, told the victim that she "was a dead girl" who "was going to get a lot worse than what [she] did." Because both the defendant and the victim were aware of the history of those prior physical altercations, the uncharged misconduct evidence bears directly on the defendant's intent in making the harassing and threatening telephone calls. For that reason, the court concluded, and we agree, that the uncharged misconduct evidence was relevant and material to the intent element of the harassment and threatening offenses.

B

The defendant nevertheless asserts that the court improperly determined that the probative value of the uncharged misconduct evidence outweighed its prejudicial impact. "[T]he primary responsibility for . . . determin[ing] whether [prior misconduct] evidence is more probative than prejudicial rests with the trial court, and its conclusion will be disturbed only for a manifest abuse of discretion. . . . Moreover, [w]hen the trial court has heard a lengthy offer of proof and arguments of counsel before performing the required balancing test, has specifically found that the evidence was highly probative and material, and that its probative value significantly outweighed the prejudicial effect, and has instructed the jury on the limited use of the

evidence in order to safeguard against misuse and to minimize the prejudicial impact . . . we have found no abuse of discretion." (Internal quotation marks omitted.) *State* v. *Cutler*, 293 Conn. 303, 312–13, 977 A.2d 209 (2009).

The court in the present case found that the uncharged misconduct evidence was "highly probative." We agree. That evidence was probative of the defendant's intent to cause the victim to be harassed, annoyed, alarmed or terrorized by the telephone calls in question. The court further found that the uncharged misconduct was not too remote, stating: "The court is aware that these incidents predate the conduct for which the defendant is charged by approximately four years and that the defendant has argued that they are too remote in time. Although the court understands the argument, having looked at some of the cases, it's clear that four years isn't necessarily all that long in terms of remoteness.[5] In addition, the proffer that the [state has] made [indicates that] there was a substantial gap in contact . . . between the defendant and the [victim]. If there had been no alleged incidents in four years while they were together continuously, I might feel somewhat differently about the evidence. But I think the time break is an important factor to consider."

The court also acknowledged that the uncharged misconduct was of a more "violent nature" than the verbal threats uttered in the telephone calls. The court nevertheless indicated that the prejudicial effect of that distinction could be mitigated by "the proper cautionary

---

[5] "Our Supreme Court has not determined whether any particular lapse of time is per se too remote for introduction of evidence of prior misconduct. See *State* v. *Romero*, 269 Conn. 481, 498–500, 849 A.2d 760 (2004) (nine year lapse not too remote); *State* v. *Kulmac*, 230 Conn. 43, 60–63, 644 A.2d 887 (1994) (seven year lapse not, per se, too remote)." *State* v. *Munoz*, 104 Conn. App. 85, 99, 932 A.2d 443 (2007).

instruction." Moreover, after determining that the probative value of the uncharged misconduct evidence outweighed its prejudicial impact, the court was careful to narrowly circumscribe the parameters in which the evidence would be admitted. In ruling on the defendant's motion in limine, the court cautioned the state as follows: "I am not going to allow very much detail at all regarding these incidents. I will allow [the state] to ask a couple [of] questions about them. Certainly, the [victim] can testify that there was an altercation between the two of them, that she sustained physical injuries. The injuries can be briefly described, but we're not going into police involvement, we're not going into any of the other facts relating to those incidents. We're going to sanitize them as much as possible." As our Supreme Court observed, "the care with which the [trial] court weighed the evidence and devised measures for reducing its prejudicial effect militates against a finding of abuse of discretion." (Internal quotation marks omitted.) *State* v. *Beavers*, 290 Conn. 386, 406, 963 A.2d 956 (2009).

Furthermore, in an attempt to minimize any prejudice that might arise from the admission of the uncharged misconduct evidence, the trial court provided the jury with limiting instructions regarding the very narrow purpose for which it could consider that evidence. The court instructed the jury that the victim's testimony concerning the prior uncharged misconduct acts "was not admitted to prove the bad character of the defendant or the defendant's tendency to commit criminal acts. Such evidence was offered by the state solely to establish, one, the defendant's intent; two, the identity of the person who committed the crimes charged in this case; and, three, the defendant's motive for the commission of the crime. You may not consider such evidence as establishing a predisposition on the part of the defendant to commit the crimes charged or to

demonstrate a criminal propensity. You may consider such evidence if you believe it and further find that it logically, rationally and conclusively supports the issues for which it's being offered by the state. On the other hand, if you do not believe such evidence or, even if you do, if you find that it does not logically, rationally and conclusively support the issues for which it's being offered by the state, then you may not consider that testimony for any purpose." It is axiomatic that "a jury is presumed to have followed a court's limiting instructions." *State* v. *Blango*, 103 Conn. App. 100, 111, 927 A.2d 964, cert. denied, 284 Conn. 919, 933 A.2d 721 (2007). "[I]nstructions limiting the use of the misconduct evidence [serve] to minimize any prejudicial effect that it otherwise may have . . . ." (Internal quotation marks omitted.) *State* v. *Orr*, 291 Conn. 642, 669, 969 A.2d 750 (2009).

In the present case, the court heard a detailed offer of proof and arguments of counsel before it performed the required balancing test. Mindful of the potential for prejudice, the court was careful to confine the state to a narrow window with respect to the admission of uncharged misconduct evidence and thereafter provided a detailed limiting instruction to the jury. We therefore conclude that the court did not abuse its discretion in admitting the uncharged misconduct evidence.

II

The defendant also claims that he was deprived of his sixth amendment right to a fair trial as a result of prosecutorial impropriety. Specifically, he claims that the prosecutor during closing argument (1) improperly appealed to the jurors' emotions and (2) argued facts not in evidence. Although the defendant did not object to any of the allegedly improper remarks at trial, they

nevertheless are reviewable. See *State* v. *Stevenson*, 269 Conn. 563, 572–73, 849 A.2d 626 (2004).

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . .

"[O]ur determination of whether any improper conduct by the state's attorney violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [204 Conn. 523, 540, 529 A.2d 653 (1987)], with due consideration of whether that misconduct was objected to at trial. . . . These factors include: the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . . [W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." (Citations omitted; internal quotation marks omitted.) *State* v. *Payne*, 303 Conn. 538, 560–63, 34 A.3d 370 (2012).

A

The defendant claims that the prosecutor improperly asked the jury to "send the message to this defendant" during her rebuttal argument. We do not agree.

At the outset of her closing argument, the prosecutor stated that "what this is . . . is a case about a young man who was bothering a young woman. That's basically what it came down to. It's your job to determine whether or not he did that. . . . [H]e contacted her on Facebook . . . . She said to him, I want you to leave me alone. And it didn't stop there. That's where it should have stopped, but it didn't. He continued to bother her and call her and harass her and threaten her. He did that in a number of ways, through the texts, through the phone calls, phone calls at her home, texts on her cell phone and phone calls to work. . . . [S]he said please leave me alone. . . . That's where it should have stopped and there never would have been this action, but it didn't stop. And then it went even further and a judge issued the restraining order, and the judge said, leave her alone, don't contact her in any way, any manner, not at work, not by phone . . . . [I]t now is an issue between the defendant and the court. . . . So, that's what this case is about."

In his closing argument, defense counsel argued that the victim's story and her behavior were "confusing." Counsel also emphasized that the state had "introduced absolutely no physical evidence," such as telephone records, text records, surveillance video from the PetSmart store or photographs of the vandalism to the victim's automobile. During her rebuttal, the prosecutor clarified certain points. In concluding, she remarked: "So, those are the facts presented by the state. It's not a story. You've heard the witnesses. . . . [A] judge issued an order and not only does he not respect her wishes to be left alone, he doesn't respect the court's wishes. . . . *Part of the system is for you as jurors to send a message to defendants and, in this particular case, to send the message to this defendant.* You didn't leave her alone. You did threaten her. You did harass her, and you did terrorize her. And you violated a court

order on two different days. So, I'm going to ask you to return a verdict of guilty." (Emphasis added.)

The defendant claims that the prosecutor's remarks improperly appealed to the emotions of the jury. We disagree. Read in isolation, the statement that "[p]art of the system is for you as jurors to send a message to defendants" plainly is improper, as it intrudes upon a defendant's constitutional presumption of innocence. When read in the context in which it was uttered, it appears to us that the prosecutor was describing, albeit inartfully, the role of jurors in sending a particular message to a particular defendant. As the prosecutor stated, "[p]art of the system is for you as jurors to send a message to defendants and, in this particular case, to send the message to this defendant. You didn't leave her alone. You did threaten her. You did harass her, and you did terrorize her. And you violated a court order on two different days. So, I'm going to ask you to return a verdict of guilty."

This court addressed a related claim in *State* v. *Tarasiuk*, 125 Conn. App. 544, 8 A.3d 550 (2010). As we explained: "[T]he prosecutor asked the jury to send [a] message to this defendant . . . . We agree with the state that *State* v. *Reynolds*, 264 Conn. 1, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004), is controlling. Our Supreme Court held that although the prosecutor may not argue that the jury should send a message to the community, the prosecutor may argue that the jury should send a message to the defendant. Id., 185–86; see also *State* v. *Griffin*, 97 Conn. App. 169, 177–78, 903 A.2d 253 (permissible to argue that the jury should make [the defendant] listen), cert. denied, 280 Conn. 925, 908 A.2d 1088 (2006). Accordingly, we conclude that the use of such comments in this case was not improper." (Emphasis omitted; internal quotation marks omitted.) *State* v.

*Tarasiuk,* supra, 552. That logic applies with equal force in the present case.

In addition, we note that the defendant did not object to the prosecutor's remark. "[T]he defendant's failure to object at trial to each of the occurrences that he now raises as instances of prosecutorial impropriety, though relevant to our inquiry, is not fatal to review of his claims. . . . This does not mean, however, that the absence of an objection at trial does not play a significant role in the determination of whether the challenged statements were, in fact, improper. . . . To the contrary, we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was [improper] in light of the record of the case at the time." (Internal quotation marks omitted.) *State* v. *Medrano,* 308 Conn. 604, 612, 65 A.3d 503 (2013). The fact that the defendant voiced no objection to the prosecutor's call for the jury to "send the message" further persuades us that it did not amount to an improper appeal to the jury's emotions.

B

The defendant also contends that the prosecutor argued facts not in evidence. He claims that the prosecutor improperly stated that (1) the defendant's "own mother wanted him arrested," and (2) the defendant knew the details of how text messages work and how records of such messages and telephone calls are kept.

"[B]ecause the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions. . . . The prosecutor, however, is not barred from commenting on the evidence presented at trial or urging the jury to draw reasonable inferences from the

evidence that support the state's theory of the case, including the defendant's guilt. It is not improper for the prosecutor to comment [on] the evidence presented at trial and to argue the inferences that the [jury] might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade [it] to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. The [prosecutor] should not be put in the rhetorical straitjacket of always using the passive voice, or continually emphasizing that he is simply saying I submit to you that this is what the evidence shows, or the like." (Citation omitted; internal quotation marks omitted.) *State* v. *Long*, 293 Conn. 31, 38–39, 975 A.2d 660 (2009).

1

The defendant argues that the prosecutor improperly "told the jury that the defendant's own mother wanted him arrested . . . even though that was exactly the opposite of the testimonial evidence." (Citation omitted.) He is mistaken.

At trial, the victim provided testimony regarding her "[h]orrible" experience living with the defendant in North Carolina for several months. She testified that, following the altercation in which the defendant had broken her nose, "his father came and picked me up and said something needed to be done. So, he called the cops and pressed the charges" by reporting the assault to the police. When asked how she left North Carolina, the victim testified that the defendant's "brother picked me up [from work] and brought me back to his house and helped me buy an airplane ticket to go back home, and he brought me to the airplane station." When later asked whether she was "friends with" the defendant's mother, the victim replied, "No,

I'm not." When the prosecutor then inquired whether she was an acquaintance, the victim stated simply, "She helps me." In response to a follow-up question, the victim acknowledged that the defendant's mother had faxed paperwork to her in the past regarding "[t]he files from my case" and "what [the defendant] was charged with and the verdict of it" in North Carolina.

The victim also testified that she had contacted the resident state trooper in Prospect when the defendant began sending her harassing and threatening text messages in June, 2010. She testified that, after talking with the trooper and sharing certain text messages on her telephone, the trooper left a statement form with her to complete and return by June 29, 2010. The victim did not complete that form "because [she] was scared."

After the state rested its case-in-chief, the defense called one witness to the witness stand, Trooper Nelson J. Abarzua. Abarzua testified that he received a telephone call from the defendant's mother on June 29, 2010, related to the investigation. The following colloquy then ensued:

"[Defense Counsel]: Based on that conversation, it was your understanding [the defendant's mother] wanted her son arrested; is that right?

"Abarzua: No, not necessarily, no.

"[Defense Counsel]: You said not necessarily?

"Abarzua: She gave me information on her son."

At that moment, the court interrupted and excused the jury for a lunch recess. The court then asked defense counsel to explain "the purpose of asking this trooper and putting in front of the jury information that would suggest that [the defendant's] mother wanted him arrested." Counsel thereafter declined to further question Abarzua.

During her closing argument, the prosecutor summarized various aspects of the evidence before the jury, with particular emphasis on the testimony of the victim, her coworkers at PetSmart and the police officers who responded to the complaints regarding the July 6 and 11, 2010 telephone calls. The prosecutor later stated: "You learned that, too, other members of his family, his brother, helped her get out of North Carolina, get her to the plane so she could get home. His mother has been faxing her documents from the North Carolina case. And his own mother wanted him arrested."

The defendant claims that her statement that "his own mother wanted him arrested" constitutes an improper reference to facts not in evidence. We disagree. The victim testified that the defendant's father "pressed the charges" against his son after he broke the victim's nose. She further testified that, following her return to Connecticut, the defendant's mother had helped her by faxing paperwork regarding that case and "what [the defendant] was charged with and the verdict" in North Carolina. In addition, Abarzua testified that the defendant's mother contacted him after the victim notified him of the harassing text messages in June, 2010. Significantly, defense counsel during his direct examination raised the specific question of whether Abarzua understood that "[the defendant's mother] wanted her son arrested . . . ." Abarzua answered, "not necessarily," and then indicated that "[s]he gave me information on her son." On those undisputed facts in evidence, the jury reasonably could infer that the defendant's mother, in fact, wanted her son arrested. Accordingly, the prosecutor's argument articulating that inference was not improper.

2

The defendant also claims that the prosecutor improperly told the jury that the defendant "knew the

details of how text messages work and how records of such messages and telephone calls are kept . . . ." (Citation omitted.) We are not persuaded.

During her closing argument, the prosecutor stated that "[c]learly, by the content of his communications, [the defendant's] intent was to annoy, alarm and terrorize her. He knew exactly how to do that. He made those phone calls from a prepaid phone that can't be traced. He sent texts where texts are not retrievable from phone companies. And [the victim] testified that her incoming calls are not recorded on her phone services. Also, that the PetSmart calls come in through a main system and go to all PetSmarts and are not traceable. He also didn't say his name, and he didn't speak on many of those calls. . . . He thought he could make all these calls, harass and annoy and terrorize her because she would not talk to him."

In his closing argument, defense counsel emphasized that the state had not produced any physical evidence. He stated in relevant part: "[N]o texts, threatening or otherwise, and most importantly, no phone records. No phone records from PetSmart, no phone records from the [victim's] cell phone and no phone records from [her] home phone. . . . Now, I'm not a technology expert. I don't even use my cell phone for texting, but I do know in this day and age of computers, computer records, cell phones, cell phone cameras, it's virtually impossible for every single shred of physical evidence of these things to disappear." Defense counsel further painted a scenario in which the victim deliberately declined to share evidence. He argued that "[i]nstead of showing us evidence, [the victim] always had an excuse why she couldn't show the evidence. She couldn't show her cell phone to the trooper because she left it at home. She couldn't show the incoming messages on her cell phone because her bill didn't show them. She couldn't get her own home phone records

because the police officers had to get them for her. She couldn't show any threatening text messages because her phone deleted the text messages after twenty-five or thirty text messages."

In her rebuttal, the prosecutor addressed "the scenario that [the victim] somehow is hiding phone records or the phone records aren't retrievable. I put this to you: How about the scenario that we have a defendant sitting right here who says nobody tells me when I can't contact you. . . . I'm going to make your life miserable. I'm going to annoy you. I'm going to frighten you, and I'm going to terrorize you for having the nerve to say no to me. I'm going to do it so you can't prove it, too, because I know how to do that. I do know how texts work. I know texts are not retrievable from phone companies. I know if I call PetSmart, they can't trace the phone call. I'm not going to call you on your cell phone and talk to you. I'm just going to text you because then you don't know who the text is from. But he made a few mistakes along the way. She said he gave his name to her initially with the phone. That's why she recognized the phone number. When it was just texts after that, then she recognized his name when she did answer the phone that one time."

The state submits, and we agree, that the prosecutor, in stating that the defendant knew that the victim would not be able to retrieve telephone records and text messages,[6] was painting an alternate scenario to that alluded to by defense counsel, one in which the defendant sought to harass the victim through covert means. That inference follows from the undisputed evidence

---

[6] We do not pass on the accuracy of the prosecutor's statement that "texts are not retrievable from phone companies," and note only that the undisputed evidence in this case indicated that the victim's cell phone had a limited capacity that deleted older text messages on an ongoing basis and that her cell phone bill "doesn't show text messages . . . ." The defendant did not offer any evidence as to the retrievability of text messages.

in the record that (1) the defendant placed the telephone calls from a prepaid telephone that could not be traced, (2) the PetSmart telephone records could not be obtained because "it was one phone land line that was based throughout all PetSmart," and (3) the victim's cell phone held a maximum of twenty-five to thirty text messages and "starts deleting the oldest text messages" as new ones arrive. Given that evidence, we cannot say that the prosecutor exceeded the " 'generous latitude' " afforded counsel in closing arguments. *State* v. *Medrano*, supra, 308 Conn. 611; see also *State* v. *Mucha*, 137 Conn. App. 173, 194, 47 A.3d 931 (limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for zeal of counsel in heat of argument), cert. denied, 307 Conn. 912, 53 A.3d 998 (2012).

Furthermore, even if we were to find the prosecutor's remarks improper, the defendant still could not prevail. Application of the *Williams* factors demonstrates in convincing fashion that any such impropriety did not amount to a denial of the defendant's right to a fair trial. The state's case, which consisted not only of the victim's largely uncontroverted testimony but also that of the investigating officers and coworkers at PetSmart who also were subjected to the telephone calls at issue, was strong. The prosecutor's few statements regarding the defendant's knowledge of how text messages and telephone records are maintained were infrequent and were not central to the critical issues of the case. Last, we note that the prosecutor's statements were not objected to at trial by defense counsel. See *State* v. *Payne*, supra, 303 Conn. 561. In light of the foregoing, the defendant's claim fails.

The judgments are affirmed.

In this opinion the other judges concurred.