******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* RONALDO MORALES
(AC 37121)

Keller, Mullins and Schaller, Js.

*Argued October 19, 2015—officially released March 29, 2016*

(Appeal from Superior Court, judicial district of
Fairfield, Kavanewsky, J.)

*John L. Cordani, Jr.*, assigned counsel, for the appellant (defendant).

*Emily D. Trudeau*, deputy assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *Ann F. Lawlor*, senior assistant state's attorney, for the appellee (state).

*Opinion*

MULLINS, J. The defendant, Ronaldo Morales, appeals from the judgment of conviction, rendered after a jury trial, of strangulation in the second degree in violation of General Statutes § 53a-64bb, unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a), threatening in the second degree in violation of General Statutes § 53a-62 (a) (1), and assault in the third degree in violation of General Statutes § 53a-61 (a) (1).[1] On appeal, the defendant claims the following: (1) his conviction of unlawful restraint, assault, and strangulation violate his constitutional right against double jeopardy; (2) his jury trial and due process rights were violated when the trial court found at sentencing that the state had proven that the unlawful restraint, assault, and strangulation charges were based on distinct and separate incidents; (3) his constitutional rights were violated when the state introduced at trial evidence of unwarned statements and other conduct; and (4) the trial court erred in admitting prior uncharged misconduct evidence on the issue of intent. We affirm the judgment of the trial court.

The jury reasonably could have found the following relevant facts. In October, 2012, after having been in a romantic relationship since earlier that year, the defendant and the victim began living together at the victim's uncle's house at 704 Garfield Avenue in Bridgeport. They lived there with the victim's son, the victim's uncle, and the uncle's friend. In December, 2012, their relationship began to sour. Consequently, in early July, 2013, the defendant began sleeping in a room in the basement instead of in the victim's bedroom.

In the early evening of July 17, 2013, the defendant and the victim were alone at home. The defendant went upstairs and knocked on the victim's bedroom door. After knocking at the door for some time, the defendant demanded that she let him in. She eventually complied.

Once inside the victim's bedroom, the defendant sat next to the victim on the side of her bed, and they discussed their relationship. At some point in the conversation, the defendant punched the victim on the side of her face. After he punched her, he then began choking her, and she lost consciousness. When she regained consciousness, he was on top of her. He expressed surprise that she was not dead and told her that he would have to kill her to prevent her from calling the police. He produced a knife and held it to her back. He then gave the knife to her and told her to kill him. She threw the knife out of reach and begged him to leave.

Then, the victim tried to leave the house. She reached the front door, which was at the bottom of the stairs leading up to her bedroom, but the defendant leapt down the stairs, intercepted her, and prevented her from leaving the house. He then dragged her back

upstairs. He forced her back into the bedroom, where she offered him money in exchange for leaving but told him that she did not have the money with her in the house. He replied that he would take her to the bank. The defendant took the victim's keys to her car and drove them to the bank.

When they arrived at the bank, which was closed, the defendant accompanied the victim to the automated teller machine. After she withdrew cash from the machine, he demanded that she give it to him, but she replied that she would give it to him in the car. When they returned to the car, she pretended to climb in until she saw that he was in the car. Once she saw that he was inside the car, she fled to a nearby Walgreen's pharmacy where an employee called the police at her request. The defendant drove away in the victim's car and was arrested thereafter.

The record also reveals the following relevant facts and procedural history. The state charged the defendant by way of an eight count substitute long form information. At the conclusion of the defendant's jury trial, he requested and received a jury instruction as to the lesser included offense of strangulation in the second degree. The jury returned a verdict of guilty on the charges of strangulation in the second degree, unlawful restraint, threatening, and assault.

At the defendant's sentencing hearing, the court, sua sponte, raised the issue of the propriety under § 53a-64bb (b)[2] of the jury's guilty verdict on the strangulation, unlawful restraint and assault charges. In response, the state summarized the evidence presented at trial, arguing that it established three separate incidents out of which the charges respectively arose. The defendant countered that the verdict on those charges could not be sustained without knowing whether the jury actually found that each charge arose from a separate incident.[3] The court concluded that there was "enough evidence to support jury verdicts on each of these counts as separate and discrete incidents." In accordance with the jury's verdict, the court imposed a total effective sentence of eight years imprisonment. This appeal followed. Additional facts will follow as necessary.

I

The defendant first claims that his conviction of and punishment for strangulation in the second degree, assault, and unlawful restraint violated his constitutional right against double jeopardy. He argues that his conviction of assault and unlawful restraint must be vacated because (1) those charges arose from the same act or transaction as the charge of strangulation in the second degree, and (2) § 53a-64bb (b) expresses the legislature's intent to treat strangulation in the second degree as the same offense as assault and unlawful restraint for double jeopardy purposes. We disagree.

Before discussing the merits of this claim, we note that the defendant never raised a double jeopardy challenge in the trial court, and, therefore, his double jeopardy claim was not preserved for appellate review. *State* v. *Thompson*, 146 Conn. App. 249, 259, 76 A.3d 273 ("[i]t is well settled that [o]ur case law and rules of practice generally limit this court's review to issues that are distinctly raised at trial" [internal quotation marks omitted]), cert. denied, 310 Conn. 956, 81 A.3d 1182 (2013). He also has not sought review of his unpreserved claim pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[4] Nevertheless, we will consider his double jeopardy claim because the record is adequate for our review and the claim is of constitutional magnitude. *State* v. *Elson*, 311 Conn. 726, 754–55, 91 A.3d 862 (2014) (no need for affirmative request for *Golding* review if record is adequate and claim is of constitutional magnitude); *State* v. *Chicano*, 216 Conn. 699, 704–705, 584 A.2d 425 (1990) (double jeopardy claim reviewable under *Golding*), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991), overruled in part on other grounds by *State* v. *Polanco*, 308 Conn. 242, 248, 261, 61 A.3d 1084 (2013).

"A defendant's double jeopardy challenge presents a question of law over which we have plenary review. . . . The double jeopardy clause of the fifth amendment to the United States constitution provides: [N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb. The double jeopardy clause is applicable to the states through the due process clause of the fourteenth amendment. . . . This constitutional guarantee prohibits not only multiple trials for the same offense, but also multiple punishments for the same offense in a single trial. . . .

"Double jeopardy analysis in the context of a single trial is a two-step process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met. . . .

"Traditionally we have applied the *Blockburger*[5] test to determine whether two statutes criminalize the same offense, thus placing a defendant prosecuted under both statutes in double jeopardy: [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. . . . This test is a technical one and examines only the statutes, charging instruments, and bill of particulars as opposed to the evidence presented at trial. . . .

"Our analysis of [the defendant's] double jeopardy [claim] does not end, however, with a comparison of

the offenses. The *Blockburger* test is a rule of statutory construction, and because it serves as a means of discerning [legislative] purpose the rule should not be controlling where, for example, there is a clear indication of contrary legislative intent. . . . Thus, the *Blockburger* test creates only a rebuttable presumption of legislative intent, [and] the test is not controlling when a contrary intent is manifest. . . . When the conclusion reached under *Blockburger* is that the two crimes do not constitute the same offense, the burden remains on the defendant to demonstrate a clear legislative intent to the contrary." (Citations omitted; footnote added; internal quotation marks omitted.) *State* v. *Wright*, 319 Conn. 684, 689–90, 127 A.3d 147 (2015).

Finally, "[o]n appeal, the defendant bears the burden of proving that the [convictions] are for the same offense in law and fact." (Internal quotation marks omitted.) *State* v. *Ferguson*, 260 Conn. 339, 361, 796 A.2d 1118 (2002).

The defendant argues that in assessing whether multiple charges arose from the same act or transaction, this court is limited to reviewing only what the state has alleged in its information. He contends that although "the state may indeed prosecute and punish a defendant for multiple assaults and strangulations committed during one continuous altercation," to do so it must distinguish those charges from one another in the information. Therefore, because in this case the state, in its information, failed to distinguish temporally, geographically, or factually among the charges of strangulation in the second degree, assault, and unlawful restraint, they necessarily arose from the same act or transaction.

Contrary to the defendant's argument, we conclude that we are not limited to a review of the state's information in order to determine whether the defendant's crimes arose from the same act or transaction. Our review of the case law leads us to conclude that the fact that the state charged him in the information with committing the subject crimes on the same date and at approximately the same time and place does not dispose of this portion of the double jeopardy analysis; rather, we are permitted to look at the evidence presented at trial. Upon reviewing that evidence, we conclude that the defendant has failed to prove that these three charges arose from the same act or transaction. As a result, we need not reach the second prong of the double jeopardy analysis of whether the defendant's conviction of these three charges was a conviction of the same offense.[6]

At the outset of our discussion, we acknowledge, as the defendant points out, that "[i]t repeatedly has been held that to determine whether two charges arose from the same act or transaction, we look to the information, as amplified by the bill of particulars, if any." *State* v.

*Mincewicz*, 64 Conn. App. 687, 691, 781 A.2d 455, cert. denied, 258 Conn. 924, 783 A.2d 1028 (2001) (citing, inter alia, *State* v. *Goldson*, 178 Conn. 422, 424, 423 A.2d 114 [1979], and collecting cases). We also acknowledge that our Supreme Court once cautioned courts making this determination to be mindful that "[t]he [d]ouble [j]eopardy [c]lause is not such a fragile guarantee that prosecutors can avoid its limitations by the simple expedient of dividing a single crime into a series of temporal or spatial units. If separate charges explicitly addressing different temporal aspects of the same conduct do not avoid the double jeopardy clause, surely an information and bill of particulars stipulating a single date and time cannot do so." (Internal quotation marks omitted.) *State* v. *Goldson*, supra, 425, quoting *Brown* v. *Ohio*, 432 U.S. 161, 169, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977).

More recent case law, however, reveals that "[i]n analyzing whether certain charges arise out of the same act or transaction, our Supreme Court repeatedly has examined the evidence submitted at trial. See, e.g., *State* v. *Brown*, 299 Conn. 640, 653–54, 11 A.3d 663 (2011); *State* v. *Kulmac*, 230 Conn. 43, 67–69, 644 A.2d 887 (1994)." *State* v. *Shenkman*, 154 Conn. App. 45, 68 n.12, 104 A.3d 780 (2014), cert. denied, 315 Conn. 921, 107 A.3d 959 (2015); see also, e.g., *State* v. *Miranda*, 260 Conn. 93, 124, 794 A.2d 506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002); *State* v. *James E.*, 154 Conn. App. 795, 834–35, 112 A.3d 791 (2015). These cases demonstrate that our appellate courts have looked beyond the information to consider the evidence presented at trial to resolve the same transaction prong of the double jeopardy analysis.

Thus, notwithstanding some older authority appearing to restrict a reviewing court's analysis to the information, we conclude, on the basis of numerous and generally more recent decisions of our appellate courts, that we may resolve whether the defendant's crimes arose from the same transaction according to whether, on the record before us, a distinct criminal act formed the basis of each offense for which the defendant was convicted and punished. See, e.g., *State* v. *Miranda*, supra, 260 Conn. 124 (holding that although state alleged continuous failure to protect from harm that led to victim's injuries, no double jeopardy violation where record established that distinct act led to each injury); accord *State* v. *Beaulieu*, 118 Conn. App. 1, 14, 982 A.2d 245 (holding that luring minor victim into location to engage in sexual act and engaging in sexual act with victim were separate acts for double jeopardy purposes), cert. denied, 294 Conn. 921, 984 A.2d 68 (2009); see also *State* v. *Shenkman*, supra, 154 Conn. App. 68 n.12, and cases cited therein.

In the present case, the state alleged in the information a course of conduct by the defendant that took place over a short span of time at the victim's uncle's

house. At trial, the state presented evidence of discrete acts that took place within that course of conduct. Although the state charged the defendant with multiple offenses arising from a course of conduct that occurred during a short period of time at a single location, our review of the record satisfies us that the jury reasonably could have concluded that each charge was based on a separate act committed with the requisite criminal intent.

Previously in this opinion, we set forth the facts that the jury reasonably could have found on the basis of the evidence presented at trial. With respect to the assault charge, the defendant's punch to the victim's face when the two of them were seated next to each other on the bed—and before any strangulation occurred—provided a basis for finding him guilty of assault that was separate from the subsequent act of strangulation. There was testimony and other evidence that the defendant, with intent to cause the victim physical injury, did cause her physical injury; see General Statutes § 53a-61 (a) (1); when he punched her on the side of her face. Specifically, upon looking in the mirror after being punched, the victim testified, she noticed that her "eyes were bad, [her] face was bad." Additionally, photographs of the victim in evidence exhibit bruising around her left eye. On the basis of the victim's testimony and the photographs depicting bruising to her face, the jury properly could have concluded that the defendant intentionally caused the victim physical injury apart from the act of strangling her.[7]

With respect to the unlawful restraint charge, the defendant's conduct toward the victim by the front door of the house, some time after he strangled her in her bedroom, provided a basis on which to convict him of unlawful restraint in the first degree that was independent of the earlier act of strangulation. There was testimony that he restrained the victim under circumstances that exposed her to a substantial risk of physical injury; see General Statutes § 53a-95 (a); when she tried to flee the home. Specifically, the evidence showed that at some point after the victim regained consciousness following the strangulation, she tried to leave through the front door of the house, which was at the bottom of the stairs from her bedroom. The defendant leaped to the bottom of the stairs, grabbed her, and dragged her back up the stairs to her bedroom. From this testimony, the jury reasonably could have found that the defendant exposed the victim to a substantial risk of physical injury through conduct separate from the act of strangulation.[8]

"Although [d]ouble jeopardy prohibits multiple punishments for the same offense in the context of a single trial . . . distinct repetitions of a prohibited act, however closely they may follow each other . . . may be punished as separate crimes without offending the dou-

ble jeopardy clause. . . . The same transaction, in other words, may constitute separate and distinct crimes where it is susceptible of separation into parts, each of which in itself constitutes a completed offense. . . . [T]he test is not whether the criminal intent is one and the same and inspiring the whole transaction, but whether separate acts have been committed with the requisite criminal intent and are such as are made punishable by the [statute]." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Brown*, supra, 299 Conn. 652; *State* v. *Miranda*, supra, 260 Conn. 122–23. "If a violation of law is not continuous in its nature, separate indictments may be maintained for each violation. Thus, a distinct repetition of a prohibited act constitutes a second offense and subjects the offender to an additional penalty." (Internal quotation marks omitted.) *State* v. *Snook*, 210 Conn. 244, 261, 555 A.2d 390, cert. denied, 492 U.S. 924, 109 S. Ct. 3258, 106 L. Ed. 2d 603 (1989). "The appropriate inquiry . . . [is] whether the statute that the defendant was charged with violating prohibited a continuous course of conduct or a distinct act." *State* v. *Miranda*, supra, 122.

It is clear that the present case does not involve distinct repetitions of the same prohibited act; cf. e.g., id., 96 and n.1 (defendant charged with two counts of first degree assault for separate acts of omission); but the violation of distinct statutory provisions requiring different mental states. As the foregoing discussion of the evidence presented at trial demonstrates, however, this is nevertheless a case in which "separate acts have been committed with the requisite criminal intent and are such as are made punishable by the [statutes]." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Brown*, supra, 299 Conn. 652.

Moreover, this court has construed the second degree strangulation statute that the defendant was charged with violating to prohibit a distinct act, not a continuous course of conduct. "[T]he same incident to which [§ 53a-64bb] refers is *an incident of strangulation . . . not an event or course of conduct in which an act of strangulation occurs, but is preceded, followed or even accompanied by other, separate acts of assault or unlawful restraint not based, in whole or in part, upon one or more acts of strangulation*." (Emphasis added.) *State* v. *Miranda*, 142 Conn. App. 657, 663–64, 64 A.3d 1268 (2013), appeal dismissed, 315 Conn. 540, 109 A.3d 452 (2015) (certification improvidently granted). The record in this case satisfies us that the jury reasonably could have found the defendant guilty of assault and unlawful restraint for discrete acts toward the victim that were separate from the act of strangling her—albeit that took place during a continuing course of conduct in which the strangulation also occurred. Accordingly, the defendant has not proved that his conviction of those charges arose from the same act or transaction.

Because the defendant has failed to prove that his conviction was based on the same act or transaction, we may resolve his double jeopardy claim without determining whether the conviction was for the same offense. See *State* v. *Marsala*, 1 Conn. App. 647, 650, 474 A.2d 488 (1984) (once court concludes offenses at issue did not arise out of same act or transaction, it need not consider distinction between them). Because the defendant's claim of a double jeopardy violation is unfounded, no constitutional violation exists that deprived him of a fair trial, and his claim fails under *Golding*.

## II

The defendant next claims that the court violated his right to a jury trial when, at sentencing, it "made factual findings as to the existence of separate incidents" to support his conviction of strangulation, unlawful restraint, and assault, which "exposed [him] to an increased range of penalties" in violation of the rule enunciated in *Apprendi* v. *New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). The state counters that the court did not expose the defendant to a greater sentence than the jury's verdict did when it merely reviewed the evidence to determine whether it supported the jury's guilty verdict on each of the charges. We agree with the state.[9]

We note that although the defendant has not requested *Golding* review, we will review his claim. See *State* v. *Elson*, supra, 311 Conn. 754–55. The record is adequate for review, as the trial court's remarks are set forth in the sentencing transcript, and a claim of a violation of the right to a jury trial is of constitutional magnitude. See id., 756. We conclude, however, that the defendant cannot prevail on his claim because there was no constitutional violation.

In *Apprendi*, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id., 490. "*Apprendi* thus applies to factual findings that serve to enhance a defendant's maximum sentence beyond that allowable *under the verdict alone*." (Emphasis added.) *State* v. *Walker*, 90 Conn. App. 737, 742, 881 A.2d 406, cert. denied, 275 Conn. 930, 883 A.2d 1252 (2005).

In the present case, at the defendant's sentencing hearing, the court considered whether the evidence adduced at trial was sufficient to support the jury's guilty verdict as to the charges of strangulation, assault, and unlawful restraint, and found that it did.[10] Our rules of practice expressly permit a trial court to make such a finding. See Practice Book § 42-51 ("[i]f the jury returns a verdict of guilty, the judicial authority . . . upon its own motion, shall order the entry of a judgment

of acquittal as to any offense specified in the verdict . . . for which the evidence does not reasonably permit a finding of guilty beyond a reasonable doubt"). The court then sentenced the defendant within the statutory maximum permitted by each conviction.[11]

As the foregoing indicates, the court did not make any factual findings prohibited under *Apprendi* because it did not find any fact that enhanced the defendant's sentence beyond the statutory maximum permitted by the jury's verdict. Rather, it simply looked at the evidence and concluded that the evidence supported the jury's verdict on each of the separate charges. Cf. e.g., *State* v. *Bell*, 283 Conn. 748, 810, 931 A.2d 198 (2007) (before sentence *enhancement* is imposed, jury, not sentencing court, must make finding that offender's extended incarceration would serve public interest). Therefore, the defendant has failed to prove that a constitutional violation occurred, and his *Apprendi* claim accordingly fails at the third stage of *Golding* review.

### III

The defendant next claims that "the state improperly discredited [him] using evidence obtained in violation of due process and *Miranda*[12] in three instances during the trial." (Footnote added.) The defendant contends that introduction of the following evidence at trial was improper: (1) statements he made in response to custodial interrogation without first being advised of his *Miranda* rights; (2) the invocation of his right to remain silent by refusing to answer questions during the postarrest booking process; and (3) the invocation of his right against unreasonable search and seizure by his refusal to remove his shirt so that police could photograph scratch marks on his body.

The following additional facts and procedural history are relevant to these claims. At trial, Officer Thomas Harper of the Bridgeport Police Department testified that in the early morning hours of July 18, 2013, he responded to a call that a suspicious vehicle was parked beneath a streetlight. Harper approached the car and saw the defendant sleeping in the passenger seat. As Harper tried to wake the defendant, the police radio dispatcher reported that the car was stolen and connected to an ongoing investigation into a possible sexual assault and kidnapping.

When he had woken the defendant, who was somewhat disoriented, Harper ordered him to exit the car, patted him down for weapons, handcuffed him, and placed him in a patrol car. The defendant asked Harper why he was being handcuffed. In response, Harper asked the defendant what he was doing in the area. The defendant replied that his friend lived nearby. Harper then suggested that they have the friend come outside to confirm the defendant's reason for being in the area. The defendant refused.

After Harper placed the defendant in the patrol car, he contacted the dispatcher. The defendant matched the dispatcher's description of the suspect wanted for sexual assault, kidnapping, and a stolen motor vehicle. Harper consequently placed him under arrest. Harper conceded that at no point did he ever advise the defendant of his *Miranda* rights but testified that he had not asked the defendant any questions regarding the incident involving the victim.[13]

Harper then transported the defendant to the police station for booking. When they arrived, the defendant, who until then had been speaking English with Harper, indicated that he did not speak English and refused to answer Harper's "pedigree" questions as to his name, date of birth, social security number, height, weight, and identifying physical characteristics. Harper summoned a Spanish interpreter, who began translating Harper's questions. The defendant provided his home address but refused to answer any further questions. Although he repeatedly asked Harper in English why he was under arrest, he continued to speak only Spanish when Harper tried to ask him booking questions. Harper testified that the defendant "would refuse to answer any questions . . . [s]o he was uncooperative at that point as far as just the regular intake procedures that we do for every prisoner."

Harper had noticed scratch marks around the defendant's neck, chest, and arms and could tell that the scratch marks continued underneath the defendant's shirt. When Harper and Officer Jeffrey Holtz attempted to photograph those marks, the defendant refused to be still or to allow them to remove his shirt. The officers eventually obtained some photographs of the defendant without removing his shirt.

On August 29, 2013, the defendant filed a motion to suppress and a motion to suppress statements. The boilerplate motions sought the suppression, inter alia, of "statements . . . obtained through violation of the defendant's [f]ifth [a]mendment right against self-incrimination without knowing and intelligent waiver of that right." The record does not reveal that there ever was a hearing or a ruling on the motions.

Because the defendant did not object at trial to the admission of this evidence, his claims are unpreserved. The state argues that the defendant's claims fail at both the first and the third stages of *Golding* review. First, the state argues that the record is inadequate because the defendant did not pursue a motion to suppress any of the evidence, the admission of which he now claims was a constitutional violation. Because the defendant merely cross-examined Harper and Holtz at trial regarding their conduct instead of moving to suppress the challenged evidence and allowing the trial court to take evidence and make factual findings regarding its admis-

sibility, the state argues, the record is devoid of the factual findings we need to review the defendant's claims. Additionally, the state argues that even if we find that the record is adequate for review of the defendant's claims, those claims fail on the merits because the defendant has not established the existence of a constitutional violation. With this in mind, we consider each of the defendant's three claims in turn.

A

We first address the defendant's claim that Harper violated his due process rights by subjecting him to custodial interrogation without first advising him of his rights under *Miranda*. It is undisputed that the defendant did not receive *Miranda* warnings. The defendant claims that he was entitled to the warnings because he was subject to custodial interrogation. He argues that the record is adequate for this court to review this claim because all of the necessary facts are "clear and undisputed based on the record." Specifically, "the record is clear that [Harper] asked [the defendant] express questions during a *Terry*[14] stop in which [the defendant] was handcuffed and admits that he did not read [the defendant] his *Miranda* rights."[15] (Footnote added.) The state argues that it was deprived of the opportunity to introduce evidence regarding the admissibility of the defendant's responses to Harper's questions, the court was deprived of the opportunity to make factual findings regarding the same, and the record is accordingly devoid of the factual findings we need to review the defendant's claim. We agree with the state.

"Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation. . . . The defendant bears the burden of proving that he was in custody for *Miranda* purposes. . . . Two discrete inquiries are essential to determine custody: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. . . . The first inquiry is factual, and we will not overturn the trial court's determination of the historical circumstances surrounding the defendant's interrogation unless it is clearly erroneous. . . . The second inquiry, however, calls for application of the controlling legal standard to the historical facts. . . . The ultimate determination of whether a defendant was subjected to a custodial interrogation, therefore, presents a mixed question of law and fact, over which our review is de novo." (Citation omitted; internal quotation marks omitted.) *State* v. *Mitchell*, 296 Conn. 449, 459, 996 A.2d 251 (2010).

"[W]hether a defendant was subjected to interrogation . . . involves a similar two step inquiry . . . .

Because this framework is analogous to the determination of whether a defendant is in custody, the ultimate determination, therefore, of whether a defendant already in custody has been subjected to interrogation also presents a mixed question of law and fact over which our review is plenary, tempered by our scrupulous examination of the record to ascertain whether the findings are supported by substantial evidence." (Citation omitted.) *State* v. *Mullins*, 288 Conn. 345, 364, 952 A.2d 784 (2008), overruled in part on other grounds by *State* v. *Polanco*, 308 Conn. 242, 248, 253, 61 A.3d 1084 (2013). "Interrogation, as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." (Internal quotation marks omitted.) *State* v. *Vitale*, 197 Conn. 396, 412, 497 A.2d 956 (1985). In the present case, we previously set forth in this opinion the trial testimony regarding Harper's alleged custodial interrogation of the defendant. Upon hearing this testimony, the court was not asked to make, nor did it make, any factual findings or legal conclusions as to whether the defendant was in custody or subject to interrogation. Our Supreme Court has clarified that "[a] record is not inadequate for *Golding* purposes because the trial court has not reached a conclusion of law if the record contains the factual predicates for making such a determination." *State* v. *Torres*, 230 Conn. 372, 378–79, 645 A.2d 529 (1994). Nevertheless, "[i]f the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, we will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim." (Internal quotation marks omitted.) *State* v. *Hampton*, 293 Conn. 435, 443–44, 988 A.2d 167 (2009); see also *State* v. *Torres*, supra, 378 (*Golding* review unavailable where record lacks factual finding that forms basis of defendant's claim, not where record merely lacks factual determination regarding issue appealed).

The present case is similar to *State* v. *Farr*, 98 Conn. App. 93, 908 A.2d 556 (2006), in which we determined that the record was inadequate to conduct *Golding* review of the defendant's claim that police had lacked a reasonable and articulable suspicion to detain him. In *Farr*, the defendant did not file a motion to suppress in the trial court; the court, consequently, did not hold a suppression hearing; and there was no other opportunity for the court to make factual or legal findings on the issue of reasonable and articulable suspicion. Id., 99. The defendant nevertheless argued that the trial transcript contained sufficient factual predicates— namely, the testimony of the detaining officer—for this court to reach the legal conclusion of whether a reasonable and articulable suspicion existed. Id., 100. This court concluded that the record was inadequate because "[w]e [did] not know if all of the facts sur-

rounding [the officer's] detention of the defendant were brought to light during the trial" and had "no way of divining what evidence the state might have presented to rebut the defendant's claim . . . ." (Internal quotation marks omitted.) Id., 101; but see *State* v. *Bereis*, 117 Conn. App. 360, 372, 978 A.2d 1122 (2009) (concluding that record was adequate to review defendant's claim that state's use of police reports and testimony referencing her post-*Miranda* silence violated her constitutional rights because "a significant portion of [the] testimony described the sequence of events, [the officer's] actions and the defendant's actions after the defendant had been taken to the police barracks" and record was not, therefore, "void of the factual circumstances surrounding the defendant's claim").

In the present case, our examination of the record leads us to conclude that it is inadequate to review the defendant's claim. At trial, Harper did testify to at least some of the circumstances under which he discovered, detained, and questioned the defendant. As in *Farr*, however, we do not know if all of the pertinent facts regarding the alleged interrogation and Harper's conduct were elicited. The state did not have the opportunity to present evidence to meet the defendant's claim that his responses to Harper were inadmissible under the circumstances. More fundamentally, the record contains no findings by the court concerning whether the defendant was subject to interrogation for *Miranda* purposes. Even if we were to assume, without deciding, that the defendant was in custody when Harper handcuffed him; see footnote 15 of this opinion; there is too scant a basis on which to determine whether the circumstances "reflect a measure of compulsion above and beyond that inherent in custody itself." (Internal quotation marks omitted.) *State* v. *Vitale*, supra, 197 Conn. 412. The defendant thus asks this court "to make a determination of fact that the trial court had not been asked to make." *State* v. *Torres*, supra, 230 Conn. 379; see *State* v. *Mullins*, supra, 288 Conn. 363–64 (first prongs of *Miranda* custody and interrogation inquiries are factual). Accordingly, the defendant's claim is not reviewable under *Golding*.

B

We next address the defendant's claim that introduction of evidence of his refusal to answer Harper's booking questions at the police station after he was formally arrested violated his due process rights because that refusal constituted an invocation of his right to remain silent. We conclude that this claim fails under the third prong of *Golding* because the defendant did not receive *Miranda* warnings before refusing to answer Harper's questions, as a result of which, under established precedent, he did not invoke his right to remain silent.

The defendant essentially claims "that the state violated the rule established by the United States Supreme

Court in *Doyle* v. *Ohio*, [426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976)], prohibiting the state from eliciting at trial evidence of a defendant's silence following the receipt of *Miranda* warnings regarding his right to remain silent." *State* v. *Bell*, supra, 283 Conn. 760. "In *Doyle*, the United States Supreme Court expanded the protections it articulated in *Miranda*, holding that the impeachment of a defendant through evidence of his silence following his arrest and receipt of *Miranda* warnings violates due process. The court based its holding [on] two considerations: First, it noted that silence in the wake of *Miranda* warnings is insolubly ambiguous and consequently of little probative value. Second and more important[ly], it observed that while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." (Internal quotation marks omitted.) *State* v. *Fluker*, 123 Conn. App. 355, 364–65, 1 A.3d 1216, cert. denied, 298 Conn. 931, 5 A.3d 491 (2010). "Our Supreme Court has reasoned that it is also fundamentally unfair and a deprivation of due process for the state to use evidence of the defendant's post-*Miranda* silence as affirmative proof of guilt. *State* v. *Kirby*, 280 Conn. 361, 400, 908 A.2d 506 (2006)." *State* v. *Bereis*, supra, 117 Conn. App. 373–74.

As the foregoing language makes clear, the threshold question is whether the defendant received *Miranda* warnings regarding his right to remain silent. As previously noted, it is undisputed that he did not. The introduction at trial of Harper's testimony that the defendant refused to respond to his "pedigree" questions, did not, therefore, contravene any implicit assurance with regard to the effect of his refusal to answer those questions.[16] Accordingly, the defendant has failed to establish that the introduction of that testimony deprived him of due process.

C

Finally, we address the defendant's claim that introduction into evidence of his refusal to allow officers to remove his shirt and photograph the scratches on his body violated due process because his refusal was an invocation of his fourth amendment right against unreasonable searches and seizure. The defendant argues that "the question [is whether he] ha[d] a fourth amendment right to refuse to remove his shirt so that two police officers could photograph his shirtless body," in which case "it [was] improper to use [his] invocation of his fourth amendment rights against him." We conclude that this claim fails under the third prong of *Golding* because the defendant has not demonstrated that any violation of a constitutional right exists.

Although the defendant characterizes his noncooperation with the police officers' attempts to photograph him as an invocation of his fourth amendment rights, similar claims typically have been analyzed under the fifth amendment's proscription of compelled self-incrimination. "[T]he prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material. . . . [B]oth federal and state courts have usually held that it offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. . . . [T]he privilege is a bar against compelling communications or testimony, but that compulsion which makes a suspect or accused the source of real or physical evidence does not violate it." (Citations omitted; internal quotation marks omitted.) *Pennsylvania* v. *Muniz*, 496 U.S. 582, 591, 110 S. Ct. 2638, 110 L. Ed. 2d 528 (1990). "A photograph taken of the defendant at the time of his arrest [is] properly admitted, despite the fact that the defendant had not then been advised of his rights under *Miranda* . . . because a photograph is not a confession or other evidence of a testimonial nature." *State* v. *Hackett*, 182 Conn. 511, 516, 438 A.2d 726 (1980).

Our appellate courts, which alternately have analyzed this type of claim under the fourth and fifth amendments, are uniform in holding that compelling an arrestee to yield physical evidence to the police does not violate the rights secured thereunder. See id., 511; *State* v. *Chesney*, 166 Conn. 630, 640, 353 A.2d 783 (taking of paraffin tests does not violate fourth and fifth amendments), cert. denied, 419 U.S. 1004, 95 S. Ct. 324, 42 L. Ed. 2d 280 (1974); *State* v. *Hassett*, 155 Conn. 225, 231–32, 230 A.2d 553 (1967) (introduction into evidence of defendant's bloodstained shoes, which police ordered him to remove after he was arrested, did not violate fourth and fifth amendments); *State* v. *Campfield*, 44 Conn. App. 6, 17, 687 A.2d 903 (1996) ("because the [atomic absorption test for detecting gunpowder residue] does not involve communications or testimony, the request that a defendant submit to such a test does not constitute questioning and the refusal to submit to the [test] does not constitute the invocation of the right to remain silent"), cert. denied, 240 Conn. 916, 692 A.2d 814, cert. denied, 522 U.S. 823, 118 S. Ct. 81, 139 L. Ed. 2d 39 (1997).

In the present case, the police officers' attempts to photograph the defendant did not constitute either an unreasonable search or compelled self-incrimination. Because the defendant had no fourth or fifth amendment right to refuse to be photographed, his noncooper-

ation was not an invocation of a constitutional right. Accordingly, the introduction into evidence of his refusal to cooperate did not violate his due process rights, and this claim fails.

For the foregoing reasons, the defendant's several *Miranda* and due process claims fail under *Golding*.

IV

Finally, the defendant claims that the trial court improperly admitted evidence of prior uncharged misconduct on the issue of intent with regard to the charge of threatening in the second degree. In support of this claim, he argues that (1) the evidence was not material to the element of intent and (2) its probative value did not outweigh its prejudicial effect. We disagree.

The following additional facts are relevant to this claim. On April 15, 2014, the state filed a notice of its intent to introduce evidence of uncharged misconduct. At trial, after the state partially had completed its direct examination of the victim, the court excused the jury so that the state could proffer evidence of prior uncharged misconduct. The state proffered evidence that in February, 2013, the defendant had threatened the victim with a knife in the kitchen of their home. On that occasion, the defendant came home early from work, destroyed some of the victim's jewelry, and, later, while they were talking in the kitchen, produced a knife and pointed it at the victim. The victim was nervous and afraid, and thought that the defendant "was capable of doing something at that moment" or could "[h]it [her] or kill [her]." He then told her that he was not capable of doing anything at that time because her son was in the house, put the knife back into a cabinet, and left the room.

The defendant initially objected to the admission of this evidence as not falling within any of the exceptions to the general rule that such evidence is inadmissible.[17] The state argued that the evidence was admissible on the issue of intent with regard to the threatening charge because the February, 2013 incident "[was] a threatening where the defendant by his actions, by his picking up a knife . . . [made the victim feel] that she was in fear that he could hurt her, or as she said, kill her."

The defendant objected to admission on the ground that the incident was too remote in time. The state countered that the proffered evidence was "not that remote in time with respect to the defendant's and the victim's relationship." The state further argued that "[t]he defendant in this case is charged with threatening, and [the evidence] would demonstrate the defendant's prior threatening behavior and would enable the state to argue the defendant's intent to cause this victim . . . to be in fear of physical injury, serious physical injury, if not being killed."

The court admitted the evidence and allowed the victim to testify regarding the February, 2013 incident.

The court stated: "[T]here are two prongs to allowing it. One is that it be relevant to an accepted purpose, and the other is that its probative value is not outweighed by any prejudicial effect. I think that the evidence is relevant to an acceptable purpose, which the state has identified as being intent. Also, I don't think that the evidence is unduly prejudicial. The evidence was that there was some dispute or altercation around Valentine's Day over some jewelry and there was an incident in the kitchen in which the defendant had a knife and directed it, pointed it at the [victim]. And then I believe the evidence was that he put it down at some point and left that immediate area. That's the nub of it. No evidence that I heard as to what he said he would do with the knife at that time. There was evidence that the [victim] had certain feelings about that behavior." The court summarized authority indicating that a threatening charge allows the prosecution to introduce evidence of the accused's prior threatening behavior to prove an intent to cause fear. Finally, the court found that the proffered evidence was not "especially remote . . . . It's a few months before the time in question."

The court then offered to give the jury a limiting instruction at the conclusion of the victim's testimony, which the defendant declined. After the jury reentered the courtroom, the victim gave substantially the same testimony that she had given in the state's proffer. In light of the defendant's waiver of a limiting instruction, the court did not give one immediately upon the conclusion of the victim's testimony.

During its final instructions to the jury, the court stated the following with regard to the evidence of prior uncharged misconduct: "[T]he state has offered evidence of other acts of misconduct of the defendant. [T]his evidence is that in February, 2013, the defendant took a knife and pointed it at the [victim], causing her fear. This is not being admitted to prove the bad character, propensity or criminal tendencies of the defendant. Such evidence is being admitted solely to show or establish the defendant's intent with respect to any specific intent crimes with which he has been charged. . . . You may not consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged or to demonstrate the criminal propensity. You may consider such evidence if you believe it and further find that it logically and rationally supports the issues for which it is being offered by the state but only as it may bear on the issue of demonstrating that the defendant had a specific intent to commit certain crimes.

"On the other hand, if you do not believe such evidence, or even if you do, if you find that it does not logically and rationally support the issue for which it's being offered by the state, namely, that the defendant had a specific intent to commit certain crimes, then

you may not consider that testimony for any purpose.

"You may not consider evidence of other misconduct of the defendant for any purpose other than the one I've just told you because it may predispose your mind unequivocally to believe that the defendant may be guilty of the offense here charged merely because of the alleged other misconduct."

We review the trial court's admission of prior uncharged misconduct evidence for abuse of discretion. "The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . .

"Our Supreme Court has established a two part test to determine the admissibility of evidence of a criminal defendant's prior misconduct. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions outlined in § 4-5 (b) of the Connecticut Code of Evidence, and, second, the probative value of such evidence must outweigh its prejudicial effect. . . .

"Although evidence of prior unconnected crimes is inadmissible to demonstrate the defendant's bad character or to suggest that the defendant has a propensity for criminal behavior . . . such evidence may be admissible for other purposes, such as to prove . . . intent . . . . That evidence tends to prove the commission of other crimes by the accused does not render it inadmissible if it is otherwise relevant and material . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Reynolds*, 152 Conn. App. 318, 324–25, 97 A.3d 999, cert. denied, 314 Conn. 934, 102 A.3d 85 (2014).

First, the defendant contends that the evidence of prior uncharged misconduct was not material to the element of intent because intent was not in dispute in this case. Specifically, "the defense never disputed intent, but rather claimed that no knives were ever present and no threats to kill were ever made." Assuming that such alleged acts were committed, he argues, there "[could] be no genuine dispute of intent" to threaten the victim with serious physical injury, in which case the challenged evidence could only lead the jury to the impermissible inference that the defendant had a propensity to engage in those acts. We are not persuaded.

"Evidence is material where it is offered to prove a fact directly in issue or a fact probative of a matter in issue. . . . Relevant evidence is defined in the Connecticut Code of Evidence, § 4-1, as evidence having any tendency to make the existence of any fact that is

material to the determination of the proceeding more probable or less probable than it would be without the evidence. The commentary to that section makes it clear that there are two separate components of relevant evidence at common law, probative value and materiality. Evidence is relevant if it tends to support the conclusion even to a slight degree. . . . Materiality is determined by the pleadings (or information) and the applicable substantive law." (Internal quotation marks omitted.) *State* v. *Rogers*, 123 Conn. App. 848, 861–62, 3 A.3d 194, cert. denied, 299 Conn. 906, 10 A.3d 524 (2010).

"[I]ntent, or any other essential element of a crime, is always at issue unless directly and explicitly admitted before the trier of fact." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Irizarry*, 95 Conn. App. 224, 233–34, 896 A.2d 828, cert. denied, 279 Conn. 902, 901 A.2d 1224 (2006); see *Estelle* v. *McGuire*, 502 U.S. 62, 69–70, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) (noting that "prosecution's burden to prove every element of [a] crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense" and holding that extrinsic act evidence is not constitutionally inadmissible merely because it relates to issue that defendant does not actively contest).

In the present case, the relevant charge is threatening in the second degree, which is a specific intent crime. Pursuant to § 53a-62 (a) (1), to obtain a conviction of this offense, the state had to prove beyond a reasonable doubt the defendant's intent to place the victim "in fear of imminent serious physical injury" when he held a knife to the victim's back and promised to kill her in July, 2013. The state proffered evidence that when the defendant, just five months earlier, in February, 2013, brandished a knife, the victim feared that he could "[h]it [her] or kill [her]." Because intent to place the victim in such fear was an essential element of the crime, the court did not err in concluding that the state's proffered evidence was relevant, which necessarily included a finding that the evidence was material. See *State* v. *Rogers*, supra, 123 Conn. App. 861–62 (relevant evidence is material and probative).

The defendant argues that the evidence was immaterial because he implicitly conceded the issue of intent and chose instead to argue that he did not engage in the acts in question. We disagree. Regardless of whether he chose to argue that he did not commit the acts in question instead of contesting the element of intent, he did not explicitly concede this essential element before the trial court. The state, therefore, bore the burden of proving both that the defendant committed the acts in question and that he did so with the intent to place the victim in imminent fear of serious physical injury. See *State* v. *Irizarry*, supra, 95 Conn. App. 233–34.

Second, the defendant contends that the probative value of the proffered evidence of prior uncharged mis-

conduct did not outweigh its prejudicial effect. In support of this argument, he offers little more than the assertion that "[t]he state's true intention in introducing this evidence was to persuade the jury that [the defendant] was a violent and threatening person who would not hesitate to draw a knife on someone." We conclude that the court properly balanced the probative value of the evidence against its prejudicial effect.[18]

"The trial court's discretionary determination that the probative value of evidence . . . outweigh[s] . . . its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown. . . . We note that [b]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury." (Internal quotation marks omitted.) *State* v. *Franko*, 142 Conn. App. 451, 465, 64 A.3d 807, cert. denied, 310 Conn. 901, 75 A.3d 30 (2013); *State* v. *Orr*, 291 Conn. 642, 667–68, 969 A.2d 750 (2009) ("[e]vidence is prejudicial when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence" [internal quotation marks omitted]).

Our appellate courts have acknowledged the probative value of a defendant's prior acts toward the same victim on the issue of intent. "When instances of a criminal defendant's prior misconduct involve the same victim as the crimes for which the defendant presently is being tried, those acts are especially illuminative of the defendant's motivation and attitude toward that victim, and, thus, of his intent as to the incident in question." *State* v. *Irizarry*, supra, 95 Conn. App. 235. "Because intent is almost always proved, if at all, by circumstantial evidence, prior misconduct evidence, where available, is often relied upon." *State* v. *Baldwin*, 224 Conn. 347, 355, 618 A.2d 513 (1993).

"[W]hen the trial court has heard a lengthy offer of proof and arguments of counsel before performing the required balancing test, has specifically found that the evidence was highly probative and material, and that its probative value significantly outweighed the prejudicial effect, and has instructed the jury on the limited use of the evidence in order to safeguard against misuse and to minimize the prejudicial impact . . . we have found no abuse of discretion. . . . Proper limiting instructions often mitigate the prejudicial impact of evidence of prior misconduct. . . . Furthermore, a jury is presumed to have followed a court's limiting instructions, which serves to lessen any prejudice resulting

from the admission of such evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Franko*, supra, 142 Conn. App. 465.

The record in the present case reveals that the court properly balanced the probative value of the evidence against its prejudicial effect. Outside of the presence of the jury, the court carefully considered the state's offers of proof, the defendant's arguments against admission, and the applicable legal authorities. With regard to probative value, the court noted, consistent with state precedent, that evidence of a defendant's prior acts toward the same victim tends to illuminate the defendant's motivation and attitude toward the victim and, thus, the intent accompanying his acts.

The court also observed that "[t]here was evidence that the [victim] had certain feelings about [the defendant's] behavior" during the prior incident. Evidence that both the defendant and the victim were aware of this history bore directly on the defendant's intent to place the victim in fear of imminent serious injury when he placed a knife at her back and threatened to kill her a few months later. See *State* v. *Kantorowski*, 144 Conn. App. 477, 489, 72 A.3d 1228 (because of shared knowledge of prior physical altercations, uncharged misconduct evidence was relevant to defendant's intent in making harassing and threatening telephone calls), cert. denied, 310 Conn. 924, 77 A.3d 141 (2013). Finally, the court noted that under the circumstances of this case, the prior incident was not sufficiently remote in time to undermine its relevance. See id., 490.

With regard to prejudicial effect, "[t]his court consistently has declined to conclude that the admission of evidence was unduly prejudicial when the prior acts of misconduct were substantially less shocking than the crimes charged." *State* v. *Dillard*, 132 Conn. App. 414, 426, 31 A.3d 880 (2011), cert. denied, 303 Conn. 932, 36 A.3d 694 (2012); *State* v. *Irizarry*, supra, 95 Conn. App. 238. In the present case, the court recognized that the February, 2013 incident was a less serious altercation than the incident forming the basis of the present charge when it noted that there was "[n]o evidence that I heard as to what he said he would do with the knife at that time." The court also minimized any unduly prejudicial effect that the evidence might otherwise have had by giving a limiting instruction in its final instructions to the jury.[19] See *State* v. *Orr*, supra, 291 Conn. 669. We conclude that the trial court did not abuse its discretion when it determined that the probative value of the prior uncharged misconduct evidence outweighed its prejudicial effect.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant was acquitted of charges of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), attempt to commit robbery in the third degree in violation of General Statutes §§ 53a-49 and

53a-136, kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (B), and larceny in the third degree in violation of General Statutes § 53a-124 (a) (1).

[2] General Statutes § 53a-64bb (b) provides in relevant part: "(b) No person shall be found guilty of strangulation in the second degree and unlawful restraint or assault upon the same incident, but such person may be charged and prosecuted for all three offenses upon the same information. . . ." Neither the court nor the defendant raised a separate constitutional double jeopardy concern, in addition to this potential statutory problem, with respect to the defendant's conviction on these three offenses.

[3] Defense counsel stated: "I agree with the court, there is enough evidence that was submitted that would sustain a verdict. But because of the statute and the uniqueness of the statute, I don't think we can rely upon the fact [alone] that [there was] just enough evidence to sustain a conviction. I think it requires more in the way of what the jury actually found. And the only way they can get that is basically through a jury instruction, which was not in this case given." Defense counsel conceded, however, that no such instruction had been requested.

[4] Under the well established principles of *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis omitted; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (modifying third condition), reconsideration denied, 319 Conn. 921, 126 A.3d 1086 (2015). "The first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the defendant may prevail." (Internal quotation marks omitted.) *In re Yasiel R.*, supra, 779 n.6.

[5] See *Blockburger* v. *United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

[6] In his attempt to satisfy the two-pronged double jeopardy test, the defendant argues that he satisfies the second prong simply because the legislature, by enacting § 53a-64bb (b), has determined that whenever strangulation, unlawful restraint, and assault are charged together, they are the same offense. As noted, we need not address this prong of the analysis. We simply point out that, having previously construed § 53a-64bb (b), we have determined, contrary to the defendant's argument, that these three crimes will be considered the same offense only if they are based on the same incident of strangulation. See *State* v. *Miranda*, 142 Conn. App. 657, 663–64, 64 A.3d 1268 (2013) ("the same incident to which the statute refers is an incident of strangulation . . . not an event or course of conduct in which an act of strangulation occurs, but is preceded, followed or even accompanied by other, separate acts of assault or unlawful restraint not based, in whole or in part, upon one or more acts of strangulation"), appeal dismissed, 315 Conn. 540, 109 A.3d 452 (2015) (certification improvidently granted).

We note that the defendant has not challenged his conviction of those charges separately under § 53a-64bb (b) in this appeal. Cf. id., 661.

[7] We recognize, as the state admitted at oral argument before this court, that the state's closing argument at trial, in which it asserted the defendant's choking of the victim as one of the bases for convicting him on the assault charge, complicates this issue somewhat. At trial, the state argued the following in closing: "[T]here was an assault at 704 Garfield where the [victim] sustained bruising. She was punched in her face, according to her testimony. The facts show that she was choked, and there was in fact physical injury as a result of those injuries. She had bruising; you'll recall the photos [in which] she had a bruise on her arm, she had bruising under her eyes, she had hemorrhages and the marks on her neck." For two reasons, we conclude that the state's convoluted restatement of the evidence before the jury does not affect the resolution of this issue.

First, as previously discussed, the record reveals a basis independent of the strangulation incident on which to convict the defendant of assault—namely, the defendant punching the victim in the face and causing her injury. Indeed, in the first part of the state's argument, it argued that the punch in the face was a basis for finding the defendant guilty of assault.

Second, although the defendant argues in passing that the court should have instructed the jury that it needed to find that each charge arose from a separate incident in order to find him guilty of all of the charges, he never requested such an instruction, and the court was not obligated to give such an instruction sua sponte. See *State* v. *Crawley*, 93 Conn. App. 548, 568, 889 A.2d 930, cert. denied, 277 Conn. 925, 895 A.2d 799 (2006). Because there was evidence that the defendant punched the victim's face before any strangulation occurred, and the state argued that the punch was a basis for the assault conviction, we conclude that the assault was based on an act separate from the strangulation.

[8] Additionally, we note that the state, in its closing argument to the jury, argued that the unlawful restraint was an act separate from the strangulation: "[The victim] tried to get out the front door, and she testified that [the defendant] jumped down the stairs at her and prevented her from leaving. . . . [T]he facts show, through her testimony, that she was not free to leave that bedroom, and she was not free to leave that house. She tried, she couldn't." The state did not argue that the strangulation itself was a basis for the unlawful restraint charge.

[9] In his reply brief, the defendant argues that because "the court's jury instructions did not require the jury to find that the assault and unlawful restraint arose from separate incidents from the strangulation," there is no way of knowing whether the jury did so. In light of this omitted instruction, he contends, the court's finding that the conviction of those charges arose from separate incidents impermissibly exposed him at sentencing to a greater range of incarceration time than the strangulation conviction supported.

To the extent that the defendant claims a flaw in the court's jury instructions, he waived this claim under *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 (2011) ("when the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal").

Before instructing the jury, the court noted that "I did send a draft of my charge to counsel . . . on Sunday night at around 7:30, and . . . apparently [defense counsel] asked for a lesser on the strangulation two, which I will give." Defense counsel did not request any other corrections or additions. At sentencing, defense counsel stated that "[w]e don't know whether it was upon the same [incident] they found him guilty . . . without the specific . . . jury charge . . . ." The court replied, "but there were no exceptions to the charge as given." Counsel conceded, "I know . . . and I understand that." Thus, because counsel had a meaningful opportunity to review the charge overnight, the court permitted comment from counsel on the charge, and counsel affirmatively accepted the charge, the defendant has waived any challenge to the court's instructions on this point.

[10] At the defendant's sentencing hearing, after discussing with counsel § 53a-64bb (b) and the evidence presented at trial, the court concluded that "[there was] evidence from which a jury could reasonably conclude that . . . the unlawful restraint and the strangulation and the assault were not part and parcel of the same incident." In other words, "[there was] enough evidence to support jury verdicts on each of these counts as separate and discrete incidents."

[11] The defendant was sentenced to imprisonment as follows: on the charge of assault in the third degree, a class A misdemeanor, one year, to run concurrent with his other sentences; see General Statutes § 53a-36 (1) (maximum sentence for class A misdemeanor is one year); on the charge of unlawful restraint in the first degree, a class D felony, three years, to run consecutive to his other sentences; see General Statutes § 53a-35a (8) (maximum sentence for class D felony is five years); on the charge of threatening in the second degree, a class A misdemeanor, one year, to run concurrent with his other sentences; see General Statutes § 53a-36 (1) (maximum sentence for class A misdemeanor is one year); and on the charge of strangulation in the second degree, a class D felony, five years, to run consecutive to his other sentences; see General Statutes § 53a-35a (8) (same).

[12] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[13] On cross-examination, the defendant gave substantially the same account of these events: he fell asleep in the parked car and was awakened

by the police, who asked him for his name and identification; he asked why he was being arrested; the police transported him to the station after informing him that the car had been reported stolen; and, at the station, the police took photographs of him.

[14] See *Terry* v. *Ohio*, 392 U.S. 1, 24, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[15] Specifically, the defendant argues that (1) he was in custody because handcuffing a suspect during the course of an investigatory stop under *Terry* v. *Ohio*, 392 U.S. 1, 24, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), rises to the level of custody for *Miranda* purposes, and (2) he was subject to interrogation because Harper should have known that asking him what he was doing in the area and whether his friend would confirm his claimed reason for being in the area was reasonably likely to elicit an incriminating response. As to whether he was in custody, the defendant points out that the United States Court of Appeals for the Second Circuit, the decisions of which, "although not binding on [this court], are particularly persuasive" in resolving issues of federal law; *Turner* v. *Frowein*, 253 Conn. 312, 341, 752 A.2d 955 (2000); has held that "a reasonable person finding himself placed in handcuffs by the police would ordinarily conclude that his detention would not necessarily be temporary or brief and that his movements were now totally under the control of the police—in other words, that he was restrained to a degree normally associated with formal arrest and, therefore, in custody" for *Miranda* purposes. *United States* v. *Newton*, 369 F.3d 659, 676 (2d Cir.), cert. denied, 543 U.S. 947, 125 S. Ct. 371, 160 L. Ed. 2d 262 (2004).

[16] We note that Harper was not required to administer *Miranda* warnings before eliciting nonincriminating biographical data from the defendant even if his questions constituted custodial interrogation. *State* v. *Jones*, 37 Conn. App. 437, 444, 656 A.2d 696, cert. denied, 233 Conn. 915, 659 A.2d 186 (1995). "In *Pennsylvania* v. *Muniz*, 496 U.S. 582, 601, 110 S. Ct. 2638, 110 L. Ed. 2d 528 (1990) . . . a plurality of the Supreme Court recognized a routine booking question exception to the requirement of *Miranda* warnings. The exception encompasses questions that secure biographical data necessary to complete booking or pretrial services. . . . The court acknowledged that the questions qualify as custodial interrogation but held that questions such as name, address, height, weight, eye color, date of birth, and age fall outside the sweep of *Miranda* . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Jones*, supra, 444.

[17] Section 4-5 (a) of the Connecticut Code of Evidence provides: "Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person." Section 4-5 (b) of the Connecticut Code of Evidence provides: "Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony."

[18] Although we agree with the defendant that the court misstated the appropriate balancing inquiry when it stated that the probative value of the evidence must not be outweighed by its prejudicial effect, our review of the record satisfies us that the court conducted the appropriate inquiry into whether the probative value of the evidence outweighed its prejudicial effect.

[19] As noted previously, the defendant declined the court's offer to provide a limiting instruction immediately following the victim's testimony.